# United States Court of Appeals for the Federal Circuit

2007-1277

DECISIONING.COM, INC.,

Plaintiff-Appellant,

v.

FEDERATED DEPARTMENT STORES, INC.,
MACYS.COM, INC., BLOOMINGDALE'S, INC.,
THE BON, INC. (doing business as The Bon Marche), BURDINES, INC.,
RICH'S DEPARTMENT STORES, INC.
(doing business as Rich's-Macy's, Lazarus and Goldsmith's),
FDS BANK, DEPARTMENT STORES NATIONAL BANK, FACS GROUP, INC.,
and FEDERATED SYSTEMS GROUP, INC.,

Defendants-Appellees.

--------------------------------------------

2007-1278

DECISIONING.COM, INC.,

Plaintiff-Appellant,

v.

TD AMERITRADE HOLDING CORPORATION, INC.,
TD AMERITRADE, INC., and TD WATERHOUSE GROUP, INC.,

Defendants-Appellees.

--------------------------------------------

2007-1308

HSBC FINANCE CORPORATION (as successor to Household International, Inc.),

Plaintiff-Appellee,

and

HSBC CARD SERVICES, INC., HSBC RETAIL SERVICES, INC.,
HSBC BANK NEVADA, N.A., HSBC BANK USA, N.A.,
and HSBC TECHNOLOGY AND SERVICES (USA), INC.,

Third Party Defendants-Appellees,

v.

DECISIONING.COM, INC.,

Defendant/Third Party Plaintiff-
Appellant.

Steven N. Terranova, Withrow & Terranova, PLLC, of Cary, North Carolina, argued for plaintiff-appellant, defendant/third party plaintiff-appellant, Decisioning.com, Inc.

Ira E. Silfin, Amster Rothstein & Ebenstein LLP, of New York, New York argued for defendants-appellees, Federated Department Stores, Inc., et al. With him on the brief was Marc J. Jason.

Kenneth C. Bass, III, Sterne, Kessler, Goldstein & Fox P.L.L.C., of Washington, DC, argued for defendants-appellees, TD Ameritrade Holding Corporation, Inc., et al. With him on the brief were Robert E. Sokohl, Mark F. Evens, and Lori A. Gordon.

Wayne L. Stoner, Wilmer Cutler Pickering Hale and Dorr LLP, of Boston, Massachusetts, argued for plaintiff-appellee and third party defendants-appellees. With him on the brief were Timothy R. Shannon and Lawrence P. Cogswell, III, of Boston, Massachusetts, Irah H. Donner, of New York, New York, and Todd C. Zubler, of Washington, DC. Of counsel were Arthur Gollwitzer III and Larry L. Saret, Michael Best & Friedrich, LLP, of Chicago, Illinois.

Appealed from: United States District Court for the District of South Carolina

Judge Cameron M. Currie

# United States Court of Appeals for the Federal Circuit

2007-1277

DECISIONING.COM, INC.,

Plaintiff-Appellant,

v.

FEDERATED DEPARTMENT STORES, INC.,
MACYS.COM, INC., BLOOMINGDALE'S, INC.,
THE BON, INC. (doing business as The Bon Marche), BURDINES, INC.,
RICH'S DEPARTMENT STORES, INC.
(doing business as Rich's-Macy's, Lazarus and Goldsmith's),
FDS BANK, DEPARTMENT STORES NATIONAL BANK, FACS GROUP, INC.,
and FEDERATED SYSTEMS GROUP, INC.,

Defendants-Appellees.

Appeal from the United States District Court for the District of South Carolina in case no. 3:03-CV-1924, Judge Cameron M. Currie.

--------------------------------------------------------

2007-1278

DECISIONING.COM, INC.,

Plaintiff-Appellant,

v.

TD AMERITRADE HOLDING CORPORATION, INC.,
TD AMERITRADE, INC., and TD WATERHOUSE GROUP, INC.,

Defendants-Appellees.

Appeal from the United States District Court for the District of South Carolina in case no. 3:03-CV-2837, Judge Cameron M. Currie.

--------------------------------------------------------

2007-1308

HSBC FINANCE CORPORATION (as successor to Household International, Inc.),

Plaintiff-Appellee,

and

HSBC CARD SERVICES, INC., HSBC RETAIL SERVICES, INC.,
HSBC BANK NEVADA, N.A., HSBC BANK USA, N.A.,
and HSBC TECHNOLOGY AND SERVICES (USA), INC.,

Third Party Defendants-
Appellees,

v.

DECISIONING.COM, INC.,

Defendant/Third Party Plaintiff-
Appellant.

Appeal from the United States District Court for the District of South Carolina in case no. 3:04-CV-1200, Judge Cameron M. Currie.

_____

DECIDED:  May 7, 2008

_____

Before MAYER, SCHALL, and LINN, <u>Circuit Judges</u>.

Opinion concurring-in-part and dissenting-in-part filed by <u>Circuit Judge</u> LINN.

PER CURIAM.

In this case, Decisioning.com, Inc. ("Decisioning") appeals from three final decisions of the United States District Court for the District of South Carolina.  <u>See</u> <u>HSBC Fin. Corp. v. Decisioning.com, Inc.</u>, No. 3:04-CV-1200 (D.S.C. Apr. 24, 2007) ("<u>HSBC Summary Judgment Order</u>"); <u>Decisioning.com, Inc. v. Federated Dep't Stores,</u> <u>Inc.</u>, No. 3:03-CV-1924 (D.S.C. Mar. 28, 2007) ("<u>Federated Summary Judgment</u>

Order"); Decisioning.com, Inc. v. TD Ameritrade Holding Corp., No. 3:03-CV-2837 (D.S.C. Mar. 28, 2007) ("TD Ameritrade Summary Judgment Order").[1]  As relevant to this appeal, the district court determined on summary judgment that Appellees did not infringe Decisioning's U.S. Patent No. 6,105,007 ("the '007 patent") as construed.  The district court's summary judgment of non-infringement in favor of the Federated Appellees is affirmed.  Its summary judgments of non-infringement in favor of the TD Ameritrade and HSBC Appellees are affirmed-in-part and vacated-in-part, and the cases of those appellees are remanded for further proceedings.

## I.  BACKGROUND

### A. The '007 Patent

Affinity Technology Group, Inc., of which Decisioning is a wholly-owned subsidiary, is the assignee of several patents that relate to automated loan processing and that descend from U.S. Patent Application Serial No. 08/113,205 ("the '205 application").  These patents include U.S. Patent No. 5,870,721 ("the '721 patent"), directed to a "system and method for real time loan approval"; U.S. Patent No. 5,940,811 ("the '811 patent"), directed to a "closed loop financial transaction method and apparatus"; and the '007 patent, which is directed



FIG.2

[1]  For ease of reference, the Defendants-Appellees in Case No. 3:03-CV-1924 (Appeal No. 2007-1277) and Case No. 3:03-CV-2837 (Appeal No. 2007-1278) are referred to as the "Federated Appellees" and "TD Ameritrade Appellees," respectively. Likewise, the Plaintiff-Appellee and Third Party Defendants-Appellees in Case No. 3:04-CV-1200 (Appeal No. 2007-1308) are referred to as the "HSBC Appellees." Collectively, these parties are referred to as "Appellees."

to an "automated financial account processing system." The '007 patent is the only patent directly relevant to this appeal.

The '007 patent claims a system that automatically processes financial account applications—for example, loan or credit card applications. In general terms, the automatic financial account processing system permits an applicant to apply for a financial account remotely without assistance from a person and to receive an account approval result within minutes. The specification explains that the system is a "closed loop" processor of applications, meaning "that all the steps involved are performed by a computer that is programmed to make the decision to approve or disapprove the request and to complete all aspects of it . . . on behalf of the financial institution within minutes of the time the consumer initiates the request for the particular service." '007 patent col.2 ll.38–48. Figure 2 of the '007 patent, seen above, illustrates an embodiment of the invention whereby the automatic loan processing is facilitated by a kiosk, "which is basically a housing that can contain all of the equipment for a borrower to use in contacting and communicating with a remote, centrally located transaction processor." Id. col.9 ll.7–10.

The '205 application, as originally filed, was directed to a "closed loop financial transaction method and apparatus." The specification and originally-filed claims illustrate that the invention sought to be captured by the '205 application related to "a method and apparatus for making loans automatically, that is, a closed loop loan."[2] The

---

[2]	The specification of the '205 application further stated: "By the term 'automatically,' it is meant that the application is received and processed, the decision made to grant or deny the loan, and the deposit of the loaned amount to the borrower's account is made entirely by computers in conjunction with voice and electronic communication equipment."

specification of the '205 application described several embodiments for interfacing the loan applicant with the loan processing system, such as a telephone, a personal computer, or a kiosk housing computer equipment. These user-interfaces required varying degrees of human interaction. For instance, while an applicant could apply with relatively little human assistance using the kiosk embodiment, the specification contemplated that other embodiments, such as the personal computer embodiment, would require a more substantial level of human interaction: "In an alternate embodiment of [sic] user interface, the loan process can be initiated with by [sic] agent, such as an insurance agent or financial planner. An agent may have a personal, 'lap top' computer with a modem and facsimile machine for use in assisting the borrower in applying for a loan."

When Decisioning filed the application that matured into the '007 patent, it sought to capture a system that processed financial accounts "without human intervention." See id. col.2 ll.48–53 ("In loan application processing, for example, the closed loop includes the steps of transferring the funds to the borrower and arranging for repayment, as well as completing the loan application and underwriting it, including execution of regulatory requirements related to consumer financing, all done without human intervention." (emphasis added)). Consequently, the specification as filed was amended to delete the embodiments which were described in the '205 application as involving human assistance, leaving only the kiosk embodiment. The claims as filed were directed to a system for providing closed loop financial transactions using a "kiosk." During prosecution, Decisioning amended the claims to delete the "kiosk" limitation but retained the limitation reciting a "computer controller" that was "carried by"

a kiosk. Along with this amendment, Decisioning explained that "[c]laim 1 has been amended to delete the kiosk element, which is not required for performing the method of the present invention." Subsequently, Decisioning amended the claims to delete the "computer controller" language and replaced the term with the "remote interface" term that appears in the claims as issued.

Claim 1 of the issued '007 patent, repeated below with the disputed terms emphasized, is representative of the claims at issue:

1. An automatic account processing system for establishing a financial account without human intervention for applicants located at a remote interface, said system comprising:
   a. a <u>remote interface</u> adapted to:
      i. allow an applicant to remotely request an account; and
      ii. receive data from an applicant;
   b. a data processing system with associated memory having establishment criteria bearing on the ability and willingness of the applicant to comply with account requirements for establishing and holding an account at a financial institution based on prescribed data obtained from the applicant and information about the applicant obtained from at least one database containing information about the applicant relevant to the ability and willingness of the applicant to comply with the account requirements;
   c. a communication network electronically coupling said data processing system to said applicant interface;
   d. without human assistance, said data processing system adapted to:
      i. receive the data from the applicant received at the remote interface;
      ii. access the at least one database for information relevant to the applicant's identity and for the information relevant to the applicant's ability and willingness to comply with the account requirements;
      iii. <u>verify the applicant's identity</u> by comparing certain of the information received from the applicant with certain of the information received from said at least one database relevant to the applicant's identity;
      iv. <u>compare</u> certain of the information received from the applicant <u>and</u> certain of the information received from said at least one database relevant to the applicant's ability and willingness to comply with the account requirements to determine in real time

and without human assistance if the applicant's requested account is approved; and

v. send a result to the remote applicant interface informing the applicant whether or not establishment of the requested account was approved.

## B. The Litigation in the District Court

Decisioning filed suit against the Federated Appellees and the TD Ameritrade Appellees in the United States District Court for the District of South Carolina. In both of these cases, Decisioning alleged that various systems used by these appellees for establishing credit accounts infringed the '007 patent. Contemporaneously, the HSBC Appellees filed a declaratory judgment action against Decisioning in the United States District Court for the District of Delaware, seeking a declaration of invalidity and non-infringement of the '007, '721, and '811 patents. That case was transferred to the district court in South Carolina pursuant to 28 U.S.C. § 1404(a).

The district court held a consolidated Markman hearing in all three cases and construed the disputed claim terms. See, e.g., Decisioning.com, Inc. v. Federated Dep't Stores, Inc., No. 3:03-CV-1924 (D.S.C. Dec. 6, 2006) ("Claim Construction Order"). As relevant to this appeal, the district court construed the term "remote interface" as "dedicated computer equipment, meaning equipment supplied by the entity providing the financial account or service . . . ." Id. at 3. It construed "verify the applicant's identity" as follows: "to confirm or substantiate the applicant's identity. This is not limited to checking biometric information and does not exclude verification using information such as name, address, and social security number plus some additional information less likely to have been improperly obtained (e.g., mother's maiden name, years at current address, years at job, etc)." Id. at 3–4 (emphasis in original). Finally, it construed the language "compare . . . and . . ." as it appears in subsection (d)(iv) of

2007-1277, -1278, -1308          7

claim 1 to require that both sets of information being compared—i.e., the "'information received from the applicant,' and 'information received from [one or more] database[s],'"—be "relevant to the applicant's ability and willingness to comply with the account requirements." Id. at 4.

Based on its construction of "remote interface" and "verify the applicant's identity," the district court granted Appellees' motions for summary judgment of non-infringement.[3] With respect to the "remote interface" term, Decisioning conceded that no Appellee literally infringed under the district court's construction of that term. Instead, it asserted infringement under the doctrine of equivalents, contending that a consumer-owned personal computer was equivalent to dedicated computer equipment supplied by the entity providing the financial account or service. The district court disagreed. It concluded that "[b]y definition, a consumer-owned piece of equipment, regardless of how similar it may otherwise be, cannot be the equivalent of 'dedicated computer equipment . . . supplied by the entity providing the financial account or service.'" Federated Summary Judgment Order at 9; TD Ameritrade Summary Judgment Order at 14; HSBC Summary Judgment Order at 6 (rejecting Decisioning's argument "for the reasons set forth in the summary judgment orders entered in Federated and Ameritrade"). The district court also concluded, based primarily on the fact that a personal computer embodiment present in the '205 application was deleted when the continuation-in-part application resulting in the '007 patent ("the '007 patent application") was filed, that prosecution history estoppel barred Decisioning from

---

[3] The TD Ameritrade Appellees received only partial summary judgment of non-infringement with respect to the "remote interface" term because they conceded that some of their accused systems employed dedicated computers that they provided. TD Ameritrade Summary Judgment Order at 8, 17.

capturing equivalents to the remote interface as construed. <u>Federated Summary Judgment Order</u> at 10–12 ("The prosecution history of the '007 Patent, therefore, reflects abandonment of consumer-owned personal computer as the means of interacting with the central system."); <u>TD Ameritrade Summary Judgment Order</u> at 15–17; <u>HSBC Summary Judgment Order</u> at 6.

As regards the "verify the applicant's identity" limitation, at summary judgment the district court interpreted its original construction to not permit verification using <u>only</u> name, address, and social security number. <u>See</u> <u>Federated Summary Judgment Order</u> at 13 ("[T]he construction adopted by the court recognizes that identity 'verification' requires a check of information which is <u>qualitatively</u> different from the specifically listed items of 'name, address, and social security number.' That qualitative difference must be such as to make the information 'less likely to have been improperly obtained' than the three specifically listed items." (emphasis in original)); <u>TD Ameritrade Summary Judgment Order</u> at 10. Based on this enhanced construction, the district court determined that the systems used by the Federated Appellees, which verify identity using name, address, social security number, <u>and</u> third-party credit card number, did not literally infringe because the third-party credit card number did not constitute "additional information less likely to have been improperly obtained." <u>Federated Summary Judgment Order</u> at 14. Similarly, it determined that the systems used by the TD Ameritrade Appellees, which use a birthdate or phone number in addition to name, address, and social security number, did not infringe because a birthdate or phone number are not types of information "less likely to have been improperly obtained." <u>TD Ameritrade Summary Judgment Order</u> at 12. The "verify the applicant's identity"

limitation did not form the basis for the district court's summary judgment of non-infringement with respect to the HSBC Appellees.

Decisioning timely appealed the district court's summary judgments of non-infringement. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## II. DISCUSSION

### A. Standard of Review

Claim construction is an issue of law, see Markman v. Westview Instruments, Inc., 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996), over which we exercise plenary review, Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc). We likewise review the district court's grant of summary judgment de novo, reapplying the standards applied by the district court. SanDisk Corp. v. Memorex Prods., Inc., 415 F.3d 1278, 1283 (Fed. Cir. 2005). Summary judgment is generally appropriate when, after making all inferences in favor of the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

### B. Analysis

Decisioning argues that the district court erroneously construed three terms: "remote interface," "verify the applicant's identity," and "compare . . . and . . . ." The district court's grants of summary judgment of non-infringement were based on its constructions of the first two of these terms. The district court did not grant summary judgment based on the last of these terms, which was argued as another ground for summary judgment, however. Because we conclude that the district court erred in its

construction of this term, and because the term is identified by the parties as a potentially-relevant term on remand, we construe it in this opinion. Decisioning argues that under the correct constructions, the district court's summary judgments of non-infringement should be overturned. We first address the correctness of the district court's claim constructions. We then determine whether the district court's grants of summary judgment can be sustained.

### 1. Claim Construction

#### a. "remote interface"

The evolution of the '205 application, through various continuation applications, left the '007 patent specification with a single disclosed embodiment: a system for providing the automatic processing of loans, without human intervention, using computer equipment housed in a kiosk. The claims of the '007 patent, however, more broadly recite a "remote interface" and are not by their terms limited to a kiosk-housed interface. Decisioning thus contends that the claim term "remote interface" should be construed to encompass systems accessed by customers not only through kiosks located in public places but also, for example, through their own personal computers over the Internet.

The district court construed the term "remote interface" to require "dedicated computer equipment, meaning equipment supplied by the entity providing the financial account or service." Claim Construction Order at 3. The court later explained that "[t]he intent of this construction was to exclude personal computer systems owned and controlled by the consumer, or by the applicant." E.g., Federated Summary Judgment Order at 9. Decisioning argues that the district court erred in restricting the "remote

interface" limitation to computer equipment that is "dedicated" to financial transactions and "supplied by" the entity providing the account. According to Decisioning, the term is broad and should be given its plain and ordinary meaning, which encompasses "any device, equipment, or means that has input and output to allow the exchange of information between the applicant and the computer controller." Appellees argue that the district court properly narrowed the claims because the specification and prosecution history support only dedicated computer equipment, and because Decisioning abandoned other embodiments—specifically, consumer-owned personal computers—when it filed the '007 patent application.

For the following reasons, we agree with the district court's general conclusion that the term "remote interface" does not encompass computer equipment that is privately owned by the consumer establishing the financial account. However, we disagree with the "dedicated" and "supplied by" limitations that the district court specifically adopted in order to exclude consumer-owned personal computers.

At the outset, we acknowledge that "there is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification." Comark Commc'ns, Inc. v. Harris Corp., 156 F.3d 1182, 1186 (Fed. Cir. 1998); accord Phillips v. AWH Corp., 415 F.3d 1303, 1323–24 (Fed. Cir. 2005) (en banc) ("In the end, there will still remain some cases in which it will be hard to determine whether a person of skill in the art would understand the embodiments to define the outer limits of the claim term or merely to be exemplary in nature."). This court has recognized that "attempting to resolve that problem in the context of the particular patent is likely to capture the scope of the actual invention more accurately than either

strictly limiting the scope of the claims to the embodiments disclosed in the specification or divorcing the claim language from the specification," Phillips, 415 F.3d at 1323–24, and, thus, that there can be "no magic formula or catechism for conducting claim construction," id. at 1324. We must read the specification in light of its purposes in order to determine "whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive." Id. at 1323. "The manner in which the patentee uses a term within the specification and claims usually will make the distinction apparent." Id. Ultimately, our "focus remains on understanding how a person of ordinary skill in the art would understand the claim terms." Id.

The plain and ordinary meaning of the term "remote interface" is admittedly broad. Divorced from the specification, it could encompass almost any user interface that is located remotely from the data processing system and that facilitates the exchange of information between the applicant and the transaction processor, including a consumer-owned personal computer. Read in light of the specification, however, we conclude that one of ordinary skill in the art would not understand the term "remote interface" in the '007 patent to encompass a consumer-owned personal computer.

The term "remote interface" does not appear in the written description of the '007 patent. Indeed, "interface" appears only once, where the preferred "user-interface" of the invention is described as computer equipment that is housed in a kiosk. '007 patent col.3 ll.44–51. The inventor used the term "kiosk" in the specification in two ways. First, the specification describes the "kiosk" as being merely a housing for the computer

equipment that constitutes the "remote interface." Id. col.9 ll.7–10 ("A kiosk is basically a housing that can contain all of the equipment for a borrower to use in contacting and communicating with a remote, centrally located transaction processor . . . ."). Second, the specification uses the term "kiosk" to represent the entire "remote interface" itself, including the required computer equipment. See id. col.3 ll.55–58 ("The kiosk can enable the consumer to establish checking and savings accounts [and] apply for and be immediately issued or sent credit and debit cards . . . ."), col.6 ll.6–9 ("Kiosk 40 is activated by drawing an ATM or bank card or equivalent through a magnetically encoded card reader 70 or by providing a member number for credit unions or a merchant number for merchants and finance companies."), col.9 ll.61–63 ("[L]oans and credit cards are but one of many types of services that can be provided by a kiosk of the type described or with slight modifications."). In construing "remote interface," we consider both senses in which the term "kiosk" is used throughout the written description.

On one hand, it is clear that the invention is not limited to a remote interface that is housed in a kiosk structure. The patent describes the kiosk housing as merely a preferred embodiment. Id. col.3 ll.44–45 ("In a preferred embodiment, the user-interface is a kiosk housing a computer controller . . . ." (emphasis added)), col.9 ll.4–6 ("The preferred embodiment for enabling a borrower to complete a loan or credit card application is housed in kiosk 40." (emphasis added)). The preferred kiosk housing, which resembles a typical bank automated teller machine, is depicted in figures 2 and 3 of the patent. We agree with Decisioning that the invention is not limited to a remote interface that is enclosed by the preferred kiosk housing disclosed in the specification.

See Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 906 (Fed. Cir. 1995) ("Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction."). In alternate embodiments, a different style of housing—or even no housing at all—may be used to enclose the remote interface.

More importantly, Decisioning made clear during prosecution that the claims of the '007 patent do not require a kiosk housing. As originally filed, claim 1 recited:

> 1. A system for providing a closed loop financial transaction to a consumer, said system comprising:
>
>> a kiosk;
>>
>> a computer controller carried by said kiosk and programmed to interact with said consumer . . . ;
>>
>> means carried by said kiosk and responsive to said computer controller for communicating to said consumer;
>>
>> input means carried by said kiosk for enabling information to be communicated by said consumer to said computer controller, said computer controller responsive to said input means;
>>
>> output means carried by said kiosk and responsive to said computer controller for responding to said financial transaction requested by said consumer; and
>>
>> . . .

(emphases added). It is apparent that claim 1 originally recited the limitation of a kiosk housing. "Kiosk" is first recited as a limitation, and the components subsequently recited are "carried by said kiosk." However, in an amendment dated August 15, 1995, the inventor deleted all references to the kiosk housing in claim 1 (the portions underlined above). In the remarks accompanying the amendment, the inventor

explained that "[c]laim 1 has been amended to delete the kiosk element, which is not required for performing the method of the present invention."  We think that the effect of this amendment was to remove the requirement that the remote interface be enclosed by a kiosk housing.  In that regard, however, we do not agree with Decisioning that the amendment actually "broadened the scope of the applicant interface" itself.

Next, we consider the inventor's alternate use of "kiosk" in reference to the entire remote interface itself—not merely a preferred housing that encloses the remote interface.  The remote interface is a component of the invention itself, and the inventor's use of "kiosk" in that manner does not merely describe a preferred embodiment of the invention.  Rather, it describes the invention itself.  E.g., '007 patent Abstract ("The transactions are provided from a kiosk . . . ."), col.4 ll.16–18 ("The use of a kiosk to make available to borrowers the communications capability for applying for a loan or credit card is another important feature of the present invention." (emphasis added)), col.4 ll.35–39 ("In fact, the present invention greatly reduces the need for financial institutions to maintain offices and makes it more cost effective for them to provide kiosks in remote areas rather than branch offices." (emphasis added)), col.9 l.63–col.10 l.6 ("[A]ll the basic services provided by financial institutions . . . can be done using the kiosk and computer controller of the present invention." (emphasis added)).

The common meaning of the term "kiosk" strongly suggests to one of ordinary skill that the claimed remote interface is installed in a publicly-accessible location.  The Oxford English Dictionary defines "kiosk" to include a "structure . . . used for the sale of newspapers" and a "telephone kiosk."  VII Oxford English Dictionary 455 (2d ed. 1989); see also The American Heritage Dictionary of the English Language 966 (4th ed. 2000)

(a "small structure, often open on one or more sides, used as a newsstand or booth"); The New Oxford American Dictionary 938 (2001) ("a small open-fronted hut or cubicle from which newspapers, refreshments, tickets, etc., are sold" and "a telephone booth"); Random House Webster's College Dictionary 730 (2d ed. 1999) ("an interactive computer terminal available for public use, as one with Internet access or site-specific information"); Random House Webster's Unabridged Dictionary 1059 (2d ed. 2001) ("a small structure having one or more sides open, used as a newsstand, refreshment stand, bandstand, etc." and "a telephone booth").

The specification is consistent with this ordinary meaning of "kiosk." The specification provides that the kiosks are placed in "convenient locations." See '007 patent col.3 ll.1–9 ("[T]he present invention is the closed loop performance of financial functions via a computer and monitor mounted in a kiosk, located in convenient places . . . ."), col.3 ll.51–55, col.4 ll.18–20. The specification further defines those "convenient locations" to include, e.g., an airport terminal, a bank, a shopping area, or a store. Id. col.3 ll.51–55. All of these locations—consistent with the ordinary meaning of "kiosk"— indicate public accessibility. Nowhere does the specification suggest that "kiosk" might encompass a consumer's privately-owned personal computer.

Further, the specification describes various features of the kiosk that would not be associated with consumer-owned personal computers. For example, the specification provides that customers exchange information with the kiosk using "touch screen" or voice recognition technology and sign documents via an electronic pen and signature pad. The Summary of the Invention states that "the present invention is the closed loop performance of financial functions via a computer and monitor . . . using

'touch-screen' or voice recognition technology, for the consumer to indicate choices and provide information, and an electronic signature pad to obtain the signature of the applicant indicating understanding and acceptance of the terms of the transaction." Id. col.3 ll.1–9; see also id. col.4 ll.25–39 (describing the use of an electronic signature pad as a "feature of the present invention"), col.4 ll.43–45 (describing the use of a "touch screen" technology as a "feature of the present invention"). The kiosk is also described as including a magnetic bank card reader, id. col.9 ll.11–15, and security camera, id. col.9 l.18. Finally, the specification provides that credit or debit cards may be imprinted and issued through the kiosk's credit card port. Id. col.3 l.63–col.4 l.9 ("An important feature of the present invention is the extent to which the financial transactions are processed by the computer controller and without human intervention. . . . Here, the processing by computer controller includes . . . [the] issuance of a transaction card, such as a credit, debit or 'smart' card, imprinted with the necessary information."), col.10 ll.20–24.

Many of these features do not evoke the use of consumer-owned personal computers today; it is even less likely that a skilled artisan would have associated them with consumer-owned personal computers as of the effective date of the patent application. See Phillips, 415 F.3d at 1313. We acknowledge that embodiments incorporating these features are claimed specifically in several of the patent's dependent claims, and that the features themselves do not limit the scope of the term "remote interface." However, we think that these features would further indicate to a skilled artisan that the "remote interface" described in the specification does not encompass a consumer-owned personal computer. They play an important role in

achieving the invention's stated purpose—i.e., the closed loop processing of financial transactions without human involvement.  See, e.g., '007 patent col.3 ll.36–42 (stating that the customer uses an electronic signature pad in order to sign loan documents, which is "important for assuring that regulatory requirements have been met").

The construction of the term "remote interface" must be resolved in the context of the particular facts before us.  See Wang Labs., Inc. v. Am. Online, Inc., 197 F.3d 1377, 1383 (Fed. Cir. 1999) ("Although precedent offers assorted quotations in support of differing conclusions concerning the scope of the specification, these cases must be viewed in the factual context in which they arose.  Whether an invention is fairly claimed more broadly than the 'preferred embodiment' in the specification is a question specific to the content of the specification, the context in which the embodiment is described, the prosecution history, and if appropriate the prior art . . . .").  Based upon the written description in this case, we conclude that the claim term "remote interface" excludes consumer-owned personal computers.  Our decision on this point has support in the case law.  See Honeywell Int'l, Inc. v. ITT Indus., Inc., 452 F.3d 1312, 1317–19 (Fed. Cir. 2006) (limiting the broader claim term "fuel injection system component" to "fuel filter," where a fuel filter was the only component disclosed in the written description and was described as "the present invention"); Toro Co. v. White Consol. Indus., Inc., 199 F.3d 1295, 1299–1302 (Fed. Cir. 1999) (construing the broader claim term "including" as requiring permanent attachment of the restriction ring to the cover, where all embodiments of the invention showed a permanently attached restriction ring and a unitary structure was described as important to the invention).

For the reasons outlined above, we conclude that the term "remote interface" in the context of the '007 patent does not encompass consumer-owned personal computers.[4] Nevertheless, we think that the district court erred in applying the "dedicated" and "supplied by" limitations to the claimed "remote interface." Engrafting the claims with these limitations produces anomalous results, not supported by the specification or the claims themselves. For example, a kiosk that is provided by a bank would be encompassed by the district court's construction, but a kiosk provided by a third party that facilitates loans for that bank would not because the kiosk is no longer "supplied by the entity providing the account." Further, the district court's construction would encompass a kiosk that is completely dedicated to financial transactions, but it would presumably exclude a kiosk that could also be used for one additional function, e.g., checking a weather report.

In sum, the district court erred in requiring the computer equipment of the remote interface to be (1) "dedicated" solely to financial transactions and (2) "supplied by" the financial institution, as neither of those limitations finds support in the specification.[5]

_____

[4] Our construction of the term "remote interface" is not based upon the prosecution history. Appellees argue that "remote interface" should be construed to exclude consumer-owned personal computers because the application that matured into the '007 patent failed to carry forward the personal computer embodiment disclosed in the original '205 application. In Cordis Corp. v. Medtronic AVE, Inc., 339 F.3d 1352 (Fed. Cir. 2003), this court confronted a similar situation, where a continuation-in-part application failed to include an embodiment from the parent application. The court determined that this fact, standing alone, was an insufficient basis to exclude that embodiment from the scope of the claims where there was no language indicating surrender of the deleted subject matter. Id. at 1358. Here, although the '007 patent as filed did not carry forward certain embodiments, there is no language present in the specification or the prosecution history to indicate that Decisioning intended to abandon any claim to this subject matter. We thus find the prosecution history inapposite.

[5] The written description states that "the present invention greatly reduces the need for financial institutions to maintain offices and makes it more cost effective for

The claim term "remote interface" refers to computer equipment installed in publicly-accessible locations, although it need not be enclosed in a "kiosk" housing. However, "remote interface" does not encompass computer equipment that is privately owned by the consumer establishing the financial account.[6] As explained above, a person of ordinary skill in the art would not understand the term "remote interface"—read in light of the specification—to encompass a consumer-owned personal computer. See Phillips, 415 F.3d at 1313.

### b. "verify the applicant's identity"

The district court construed "verify the applicant's identity" as follows: "to confirm or substantiate the applicant's identity. This is not limited to checking biometric information and does not exclude verification using information such as name, address, and social security number plus some additional information less likely to have been improperly obtained (e.g., mother's maiden name, years at current address, years at job, etc)." Claim Construction Order at 3–4 (emphasis in original). However, at summary judgment, the district court interpreted its construction to require the verification to consist of information that is both quantitatively and qualitatively more

---

them to provide kiosks in remote areas rather than branch offices." '007 patent col.4 ll.35–39 (emphasis added). Without more, however, we are not convinced that the remote interface may only be supplied by the financial institution providing the account.

[6] Dependent claim 16 claims "[t]he automatic account processing system of claim 1 wherein said remote interface is a public kiosk." We acknowledge that our construction of "remote interface" arguably renders the term "public" in claim 16 surplusage. However, we have recognized that "no canon of claim construction is absolute in its application," Renishaw PLC v. Marposs Societa' Per Azioni, 158 F.3d 1243, 1248 (Fed. Cir. 1998), and that surplusage may exist in some claims, see Pickholtz v. Rainbow Tech., Inc., 284 F.3d 1365, 1373 (Fed. Cir. 2002). In light of the intrinsic evidence that we have discussed, we conclude that the claims of the '007 patent are limited to a publicly-accessible "remote interface" despite the fact that such a construction may render the term "public" in claim 16 surplusage.

substantial than that based on name, address, and social security number alone. Federated Summary Judgment Order at 13; TD Ameritrade Summary Judgment Order at 10.

As an initial matter, Appellees argue that Decisioning is judicially estopped from challenging this construction because it failed to object to and did not seek reconsideration of this construction, even though it requested reconsideration of other constructions. We are unpersuaded by Appellees' argument. The district court's initial construction, which Appellees assert Decisioning failed to challenge, is at best ambiguous, because on its face it does not also exclude Decisioning's proffered construction, which would permit verification using name, address, and social security number only. At summary judgment, however, the construction was interpreted as requiring additional information when verification was based on those three types of information alone. Cf. Federated Summary Judgment Order at 13 ("[T]he construction adopted by the court recognizes that identity 'verification' requires a check of information which is qualitatively different from the specifically listed items of 'name, address, and social security number.' That qualitative difference must be such as to make the information 'less likely to have been improperly obtained' than the three specifically listed items." (emphasis in original)); TD Ameritrade at 10. Decisioning opposed this interpretation of the claim term at summary judgment when Appellees urged the district court to apply it. Consequently, judicial estoppel is inapplicable. See New Hampshire v. Maine, 532 U.S. 742, 749 (2001) (judicial estoppel determination based on several factors, including (1) whether the party's later position is "clearly inconsistent" with its earlier position; (2) whether the party succeeded in persuading a

court to accept its earlier position; and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped).

With respect to the merits of the district court's construction, Decisioning argues that the district court improperly engrafted limitations onto the claims by requiring that "additional information less likely to have been improperly obtained" be used in conjunction with name, address, and social security number. Appellees counter that the district court's construction is supported by the specification and prosecution history.

We agree with Decisioning and conclude that this claim term is entitled to its plain and ordinary meaning: "to confirm or substantiate the applicant's identity." The claim language itself does not require that any particular type or quantity of information be used to verify the applicant's identity; it requires only that the account processing system "verify the applicant's identity by comparing certain of the information received from the applicant with certain of the information received from said at least one database relevant to the applicant's identity." '007 patent col.11 ll.3–6. Although the specification contains sparse disclosure detailing how verification of the applicant's identity is to occur, nowhere can a disavowal of the broad claim scope fairly be found. Appellees seize on the specification's description of a preferred embodiment, where the specification reveals that the identity of the applicant may be verified, in the course of a fraud check, using information in addition to name, address, and social security number:

> Before the application is approved, however, there are several checks made by transaction processor 10 to prevent fraud. For example, the name of the applicant and the applicant's signature is verified, both electronically. Information obtained from the applicant including date of birth and the number of years with present employer, is compared to that

available from a credit report or other sources such as the national death and birth records, drivers' licenses, criminal records, etc.

Id. col.7 l.66–col.8 l.7.

This description of a preferred embodiment, in the absence of a clear intention to limit claim scope, is an insufficient basis on which to narrow the claims. See Liebel-Flarsheim, 358 F.3d at 906.

### c. "compare . . . and . . ."

The claims recite a data processing system adapted to "compare certain of the information received from the applicant and certain of the information received from said at least one database relevant to the applicant's ability and willingness to comply with the account requirements to determine in real time and without human assistance if the applicant's requested account is approved." '007 patent col.11 ll.7–13 (emphasis added). The district court construed the disputed comparison language to require that both sets of information being compared—i.e., (i) that received from applicant and (ii) that received from the database—"[be] relevant to the applicant's ability and willingness to comply with the account requirements." Claim Construction Order at 4. Decisioning argues that the district court's construction is erroneous because it is inconsistent with the plain language of the claims. Appellees urge us to affirm the district court's interpretation based upon their own parsing of the claim language.

We conclude that the plain language of the claims requires only the information received from the "database relevant to the applicant's ability and willingness to comply with the account requirements" necessarily be "relevant to the applicant's ability and willingness to comply with the account requirements." The modifying phrase, "relevant to the applicant's ability and willingness to comply with the account requirements," is

2007-1277, -1278, -1308          24

clearly linked to the "at least one database" recited in the claim. In the language of the disputed sentence, each reference to information is preceded by the phrase "certain of the information," making distinct the types of information being compared. Thus, the data processing system "compare[s] [1] <u>certain of the information received from the applicant</u> and [2] <u>certain of the information received from said at least one database relevant to the applicant's ability and willingness to comply with the account requirements</u> to determine in real time and without human assistance if the applicant's requested account is approved." '007 patent col.11 ll.7–13 (emphases added). This sentence structure is also used elsewhere in claim 1 to distinguish between two types of information being compared. See <u>id.</u> col.11 ll.3–6 ("verify the applicant's identity by comparing [1] <u>certain of the information received from the applicant</u> with [2] <u>certain of the information received from said at least one database relevant to the applicant's identity</u>.") (emphases added).

Moreover, the claims, when read as a whole, demonstrate that the "relevant to" modifier describes the type of database from which the information is being culled. This characteristic is highlighted by the description of the data processing system in claim 1:

> a data processing system with associated memory having establishment criteria bearing on the ability and willingness of the applicant to comply with account requirements for establishing and holding an account at a financial institution based on prescribed data obtained from the applicant and information about the applicant obtained from <u>at least one database containing information about the applicant relevant to the ability and willingness of the applicant to comply with the account requirements</u>.

<u>Id.</u> col.10 ll.50–59 (emphasis added). This passage confirms that the disputed "compare . . . and . . ." language envisions the comparison of two types of data: that received "from" the applicant (e.g., name, telephone number, etc.) and that received "about" the applicant from a credit database (e.g., credit score). The specification is in

accord. See id. col.3 ll.21–27 ("Information about the applicant is also obtained via electronic transfer of data to the computer from one or more databases, including those that provide name and address based on a caller's telephone number, and from credit bureaus that provide credit reports on an applicant given an applicant's name, a social security number and an address."); id. col.6 ll.40–44 ("[T]ransaction processor 10 initially needs only the applicant's name, address and social security number for identification. This information is used to obtain a credit report from a credit bureau.").

For these reasons, only the information received from the "at least one database" is required to be "relevant to the applicant's ability and willingness to comply with the account requirements."

## 2. Summary Judgment

As discussed above, our construction of "remote interface" encompasses only publicly-accessible computer equipment that is located remotely from the data processing system and that facilitates the exchange of information between the applicant and the transaction processor. Thus, Appellees' systems that are accessed solely via consumer-owned personal computers do not literally infringe the '007 patent. Further, Decisioning is precluded from asserting that those systems infringe under the doctrine of equivalents, as doing so would vitiate an element of the claims—i.e., "remote interface" as construed. See Athletic Alternatives, Inc. v. Prince Mfg., Inc., 73 F.3d 1573, 1582 (Fed. Cir. 1996) ("As a corollary to the 'all limitations' rule discussed above, we have held that 'the concept of equivalency cannot embrace a structure that is specifically excluded from the scope of the claims.' Applying this formulation to the undisputed facts of the instant case, we conclude that the intermediate offset distance

required by the properly construed claim cannot have an equivalent in a racket with only two offset distances. In other words, the two-distance splayed string system was 'specifically excluded from the scope of the claims.'" (citations omitted)); see also Seachange Int'l, Inc. v. C-COR Inc., 413 F.3d 1361, 1377–78 (Fed. Cir. 2005) (construing "network for data communications" to require direct, point-to-point connections between processors and concluding that equivalence of a network in which the connections were indirect would vitiate the claim phrase as construed); Novartis Pharms. Corp. v. Abbott Labs., 375 F.3d 1328, 1337–38 (Fed. Cir. 2004) (construing "lipophilic phase component" as limited to non-surfactant excipients and concluding that a surfactant cannot be the equivalent of a non-surfactant); Searfoss v. Pioneer Consol. Corp., 374 F.3d 1142, 1150–51 (Fed. Cir. 2004) (construing "actuation means for connecting said tension bail to said extension assembly" as requiring a direct connection through an actuation means and finding that equivalence of an indirect connection would vitiate "connecting" as construed).

In granting the Federated Appellees' motion for summary judgment of non-infringement, the district court stated that "access to the Federated websites is through consumer-owned personal computers and is never through dedicated computer equipment nor through equipment supplied by Federated." Federated Summary Judgment Order at 7. On appeal, Decisioning does not dispute that characterization of the Federated Appellees' systems. Thus, we affirm the district court's grant of the Federated Appellees' motion for summary judgment of non-infringement.

With respect to the HSBC Appellees, the district court stated that "HSBC asserts and [Decisioning] does not contest that the services at issue in this action are all

provided through consumer-owned personal computers." <u>HSBC Summary Judgment Order</u> at 2. However, the record on appeal reflects that the HSBC Appellees' systems are accessed "in some cases via personal computers supplied by and operated on the store floor of HSBC clients, such as retailers." We are unable to reconcile the district court's statement in the <u>HSBC Summary Judgment Order</u> with the record before us on appeal. Therefore, we affirm the district court's grant of the HSBC Appellees' motion for summary judgment of non-infringement only with respect to systems that are accessed solely via consumer-owned personal computers. Likewise, we affirm the district court's grant of the TD Ameritrade Appellees' motion for summary judgment of non-infringement only with respect to systems that are accessed solely via consumer-owned personal computers.

We have also construed the "verify the applicant's identity" and "compare . . . and . . ." limitations on appeal.[7] We are unable to determine, based on the record before us, whether the HSBC and TD Ameritrade Appellees are entitled to summary judgment of non-infringement under our modified claim constructions. Accordingly, we vacate the district court's grants of summary judgment of non-infringement with respect to the systems of the HSBC and TD Ameritrade Appellees that are accessed via means other than consumer-owned personal computers, and remand for further proceedings consistent with this opinion.

---

[7]    As an alternative basis for affirming the district court's summary judgment of non-infringement, Appellees urge us to construe the "whether or not . . . approved" limitation that appears in subsection (d)(v) of claim 1. We offer no opinion on the court's construction of "whether or not . . . approved," however, because it was not relied upon in the district court's summary judgment orders, and because we do not consider the record before us with respect to that limitation adequately developed.

III.  CONCLUSION

The district court's claim construction is modified in accordance with this opinion. The district court's summary judgment of non-infringement in favor of the Federated Appellees is affirmed.  The district court's summary judgments of non-infringement in favor of the HSBC and TD Ameritrade Appellees are affirmed-in-part and vacated-in-part, and the case is remanded for further proceedings consistent with this opinion.

AFFIRMED-IN-PART, VACATED-IN-PART, and REMANDED

COSTS

No costs.

# United States Court of Appeals for the Federal Circuit

2007-1277

DECISIONING.COM, INC.,

Plaintiff-Appellant,

v.

FEDERATED DEPARTMENT STORES, INC.,
MACYS.COM, INC., BLOOMINGDALES'S, INC.,
THE BON, INC. (doing business as The Bon Marche), BURDINES, INC.,
RICH'S DEPARTMENT STORES, INC.
(doing business as Rich's-Macy's, Lazarus and Goldsmith's),
FDS BANK, DEPARTMENT STORES NATIONAL BANK, FACS GROUP, INC.,
and FEDERATED SYSTEMS GROUP, INC.,

Defendants-Appellees.

Appeal from the United States District Court for the District of South Carolina in case no. 3:03-CV-1924, Judge Cameron M. Currie.

----------------------------------------------------------

2007-1278

DECISIONING.COM, INC.,

Plaintiff-Appellant,

v.

TD AMERITRADE HOLDING CORPORATION, INC.,
TD AMERITRADE, INC., and TD WATERHOUSE GROUP, INC.,

Defendants-Appellees.

Appeal from the United States District Court for the District of South Carolina in case no. 3:03-CV-2837, Judge Cameron M. Currie.

----------------------------------------------------------

2007-1308

HSBC FINANCE CORPORATION (as successor to Household International, Inc.),

Plaintiff-Appellee,

and

HSBC CARD SERVICES, INC., HSBC RETAIL SERVICES, INC.,
HSBC BANK NEVADA, N.A., HSBC BANK USA, N.A.,
and HSBC TECHNOLOGY AND SERVICES (USA), INC.,

Third Party Defendants-
Appellees,

v.

DECISIONING.COM, INC.,

Defendant/Third Party Plaintiff-
Appellant.

Appeal from the United States District Court for the District of South Carolina in case no. 3:04-CV-1200, Judge Cameron M. Currie.

LINN, <u>Circuit Judge</u>, concurring-in-part and dissenting-in-part.

I am pleased to join the majority opinion, with the exception of part II.B.1.a. In that part, the majority concludes that the claimed "remote interface" cannot encompass consumer-owned personal computers, thereby effectively engrafting a "publicly-accessible" limitation onto the term. <u>E.g.</u>, <u>Maj. Op.</u> at 19 ("Based upon the written description in this case, we conclude that the claim term 'remote interface' excludes consumer-owned personal computers."); <u>id.</u> at 21 ("The claim term 'remote interface' refers to computer equipment installed in publicly-accessible locations . . . ."). Because I am unable to find support anywhere in the specification or prosecution history for limiting the term in this manner, I respectfully dissent.

The claims of the '007 patent broadly recite a "remote interface" for use in an automatic account processing system. E.g., '007 patent, claim 1. The only requirements imposed on the "remote interface" are that it be adapted to "allow an applicant to remotely request an account" and to "receive data from an applicant." Id. The claim language itself does not require that the "remote interface" be publicly-accessible; in other words, it does not foreclose the use of a consumer-owned personal computer to accomplish these functions. Because the claim language places no such restriction on the scope of the claims, the question is whether, despite the broad language used, the claims should nevertheless be limited based on a disclaimer or disavowal of scope in the specification or prosecution history. The majority concedes that no such disclaimer is present in the prosecution history, Maj. Op. at 20 n.4, but determines that the specification is sufficient to surrender claim scope.

As the majority acknowledges, id. at 15, "the claims of [a] patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'" Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 906 (Fed. Cir. 2004) (quoting Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1327 (Fed. Cir. 2002)). The majority does not point to "words or expressions of manifest exclusion or restriction" evidencing "a clear intention to limit the claim scope," however, but instead equates the claimed "remote interface" with the preferred "kiosk" embodiment described in the specification. After making various observations about kiosks in general, see id. at 16 ("The common meaning of the term 'kiosk' strongly suggests . . . that the claimed remote interface is installed in a publicly-accessible location."); id. at 17 ("[T]he specification describes

various features of the kiosk that would not be associated with consumer-owned personal computers."), the majority concludes that one of ordinary skill would understand "remote interface" to be limited to the fundamental characteristics of kiosks.

With all due respect to my colleagues in the majority, I find this conclusion unsupportable. The majority recognizes that the kiosk is merely a "housing" for the "remote interface," id. at 13-14, that the "remote interface" should not be limited to the preferred "kiosk" embodiment, id. at 14, and that the "remote interface" may have a different type of housing or no housing at all, id. at 15. Nevertheless, the majority incongruously equates "remote interface" with "kiosk" to justify engrafting the "publicly-accessible" characteristic of kiosks onto the "remote interface" term. I cannot subscribe to the majority's seemingly contradictory analysis that the "remote interface" is not limited to a "kiosk" except when it is. Compare id. at 14 ("[I]t is clear that the invention is not limited to a remote interface that is housed in a kiosk structure. The patent describes the kiosk housing as merely a preferred embodiment."), with id. at 16 ("The remote interface is a component of the invention itself, and the inventor's use of 'kiosk' in that manner does not merely describe a preferred embodiment of the invention. Rather, it describes the invention itself."). Moreover, although the majority contends that the written description can also be read to use the term "kiosk" "to represent the entire 'remote interface' itself," id., the fact remains that the specification, in the portions cited by the majority to reinforce this proposition, simply uses "kiosk" as shorthand for both the housing and the "remote interface" contained therein. This nomenclature is unremarkable, since the sole disclosed preferred embodiment is a kiosk. See '007 patent, col. 3, ll. 44-46 ("In a preferred embodiment, the user-interface is a kiosk

housing a computer controller, at least one telecommunications link, a monitor or 'touch-screen monitor' . . . .").

In my view, the majority's construction, which limits the broadly-claimed "remote interface" to the characteristics of the disclosed "kiosk" embodiment, violates fundamental tenets of claim construction precedent. See Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) ("It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" (quoting Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004))); Markman v. Westview Instruments, Inc., 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc) ("The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims."); Cont'l Paper Bag Co. v. E. Paper Bag Co., 210 U.S. 405, 419 (1908) ("The invention, of course, must be described and the mode of putting it to practical use, but the claims measure the invention." (emphasis added)); cf. McCarty v. Lehigh Valley R.R. Co., 160 U.S. 110, 116 (1895) ("[I]f we once begin to include elements not mentioned in the claim, in order to limit such claim, and avoid a defense of anticipation, we should never know where to stop.").

I am unable to find a clear intention to disavow consumer-owned personal computers in the written description. To the contrary, I read the specification to broadly describe an automatic account processing system which encompasses—consistent with the language of the claims—virtually any user interface that facilitates the exchange of information between the applicant and the claimed data processing system. See '007 patent, col. 2, ll. 55-58 ("[T]he [loan processing] apparatus uses a computer controller

and a telecommunications link, plus other electronic communications equipment, to enable the complete, automated processing of the application . . . .").  Thus, applying the appropriate standard, the "remote interface" term should carry its plain and ordinary meaning: "a user interface located remotely from the data processing system that allows the exchange of information therebetween."  Because the majority fails to accord the "remote interface" term the scope to which it is entitled, I respectfully dissent from part II.B.1.a.