# United States Court of Appeals for the Federal Circuit

---

**MYSPACE, INC.,**

*Plaintiff-Appellee,*

**and**

**FOX AUDIENCE NETWORK, INC.,**

*Third Party Defendant-Appellee,*

**and**

**CRAIGSLIST, INC.,**

*Plaintiff-Appellee,*

v.

**GRAPHON CORPORATION,**

*Defendant/Third Party Plaintiff-Appellant.*

---

2011-1149

---

Appeal from the United States District Court for the Northern District of California in consolidated case nos. 10-CV-0604 and 10-CV-1156, Judge Elizabeth D. LaPorte.

---

Decided: March 2, 2012

---

KEVIN B. COLLINS, Covington & Burling, LLP, of Washington, DC, argued for plaintiff-appellee, Myspace, Inc. and third party defendant-appellee, Fox Audience

Network, Inc. With him on the brief was JEFFREY M. DAVIDSON, of San Francisco, California.

CHRISTOPHER KAO, Perkins Coie, LLP, of Palo Alto, California, argued for the plaintiff-appellee, Craiglist, Inc. With him on the brief was J. PATRICK CORRIGAN.

MICHAEL D. ROUNDS, Watson Rounds, of Reno Nevada, argued for defendant/third party plaintiff-appellant. With him on the brief were CASSANDRA P. JOSEPH and ADAM K. YOWELL.

---

Before NEWMAN, MAYER, and PLAGER, *Circuit Judges.*
Dissenting opinion filed by *Circuit Judge* MAYER.

PLAGER, *Circuit Judge.*

This is a patent infringement case in which plaintiffs, MySpace, Inc. and craigslist, Inc., filed declaratory judgment suits in the Northern District of California against defendant GraphOn Corporation ("GraphOn"). Plaintiffs alleged that certain patents owned by GraphOn were invalid and not infringed by them. GraphOn counterclaimed for infringement, and asserted third-party claims against Fox Audience Network, Inc. ("FOX"). Plaintiffs' suits were consolidated. Shortly thereafter, FOX joined MySpace in a summary judgment motion on the issue of invalidity, and craigslist followed with its own summary judgment motion that incorporated by reference the MySpace/FOX motion. These three parties will hereafter be referred to as "the MySpace parties."

The District Court granted the MySpace parties' motion for summary judgment, and rendered final judgment for the MySpace parties. GraphOn timely appeals. Because we believe the case is properly decided under

§§ 102 and 103 of the Patent Act and not under § 101, and because the district court did not err in its grant of summary judgment of invalidity of the patents-in-suit under those sections, we *affirm*.

BACKGROUND

1. Underlying Technology

For purposes of this opinion, we need only summarize the history and development of the underlying patented technology in this case, which relates to the ability to create, modify, and store database records over a computer network. For a full description, see the district court's opinion, *MySpace, Inc. v. GraphOn Corp.*, 756 F. Supp. 2d 1218 (N.D. Cal. 2010).

In the early 1980's, desktop software applications ran entirely on a single computer, so that the files, code, and data relating to a given program were all stored on a personal computer ("PC"). This configuration presented a problem for larger-scale applications. Users could not easily share documents, images, files, and other data between computers.

The mid-1980's to mid-1990's brought about the development of client-server applications. *Id.* at 1222. Companies began placing their applications on a server so that client machines could access files, documents, and other data held in a centralized location. This configuration allowed for easier sharing of information and enabled users to reduce the amount of data stored in the memory of their PCs. The data stored on the centralized servers were generally stored in file systems. *Id.* File systems are a method of organizing and storing data that are typically configured hierarchically using a parent-child

type of relationship[1] similar to the folder and directory configuration common in today's PC operating systems.

While a marked improvement from the early single desktop PC configuration, the file system-based client-server configuration was not without its problems. Issues such as functionality, performance, and data security became troublesome for many applications. Spielman Decl. at ¶ 36. Further, the file system method of data storage was not easily searchable or writable. *Id.* at ¶¶ 41 and 69-70. Consequently, the notion of using a relational database to store information on these servers was born.

A relational database separates the stored data into multiple relations or "tables" and connects them through the use of identification ("ID") fields. *MySpace, Inc.*, 756 F. Supp. 2d at 1223. An ID field generally is a numeric field that can be synchronized across multiple tables in order to allow for faster searching, storing, and editing of information. Because the data is compartmentalized into tables, relational databases can be configured so that the ID fields that map to sensitive textual fields, such as security numbers and bank account information, can be locked while less guarded data, such as a person's name and gender, are available upon query.

### 2. Patents-In-Suit and Procedural History

The four patents at issue, U.S. Patent Nos. 6,324,538 ("'538 Patent"), 6,850,940 ("'940 Patent"), 7,028,034 ("'034 Patent"), and 7,269,591 ("'591 Patent"), disclose a method and apparatus that allow a user to create, modify, and

---

[1] In the view of software designers, in a parent-child relationship each parent may have multiple children, but each child may only have one parent. Declaration of Susan Spielman ("Spielman Decl.") at ¶ 39.

search for a database record over a computer network. *Id.* All four patents claim priority to a parent application, filed on December 14, 1995, and subsequently issued as U.S. Patent No. 5,778,367 ("'367 Patent"), that is not being contested in this case. *Id.*

The inventors of the patents-in-suit were motivated to find a way to better control the content of an Internet listing. *Id.* Early search engine developers edited and categorized each listing based on their own understanding of the listing without input from the user. *Id.* This occasionally created listings that were miscategorized or that contained typographical errors—both of which were difficult to search. The inventors attempted to solve these problems by creating a system that enabled a user to control the creation and classification of the user's own database entry over a computer network such as the Internet. *Id.* Users could create a database entry with their own text and graphics and then choose or create searchable categories that best matched the information. *Id.* The patents-in-suit claim various aspects of this invention.

Before the earliest priority date of the patents-in-suit, however, the *Mother of all Bulletin Boards* ("MBB") was developed by Dr. Oliver McBryan at the University of Colorado. The MBB was first made available for public use in November 1993, more than two years before the priority application for the patents-at-issue was filed. *Id.* at 1224. The MBB provided the ability to have online Internet catalogues that could grow through user input without the need for intervention by a webmaster or administrator. *Id.* The MBB stored all its entries in the file system of the computer running the MBB. The data within the file system was stored hierarchically as opposed to relationally.

As earlier noted, not long after the MySpace and craigslist cases were consolidated in May of 2010, MySpace and FOX jointly filed a motion for summary judgment on the issue of invalidity of all four patents-in-suit. This motion was based on the MBB prior art system. The motion sought summary judgment that all the claims were invalid as anticipated or obvious. And as noted, days later craigslist also filed a similar motion for summary judgment. A hearing was held on October 1, 2010. Following the hearing, and pursuant to the court's instruction, each party filed supplemental briefs directed towards specific topics including the functioning of the MBB software. In November 2010 the district court entered an order granting the motion for summary judgment of invalidity. The district court concluded that all the claims were either anticipated or rendered obvious by the MBB, and entered a final Judgment under Fed. R. Civ. Pro. 54(b) for the MySpace parties.

GraphOn timely appealed. Under 28 U.S.C. § 1295(a)(1), we have jurisdiction over final judgments arising under the patent laws.

## DISCUSSION

### 1. Claim Construction

The parties dispute what is covered by the term "database," a term that is found in each of the 73 claims in the patents-in-suit. Although our precedent establishes that claim construction is an issue of law that we review without deference, *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454–55 (Fed. Cir. 1998) (en banc), we weigh carefully the guidance provided by the trial court.

If the term "database" is understood to cover different types of data organization systems, including both file (hierarchical) and relational systems, then the MBB,

which all parties concede is prior art and which taught the same basic approach as the patents-in-suit, would invalidate all the claims as either anticipated under 35 U.S.C. § 102 or obvious under § 103. If, on the other hand, "database" covers only relational systems as urged by GraphOn, it would not be so clear that the MBB invalidates the claims because the patents-in-suit would be understood to disclose and claim a differently-designed system to accomplish essentially the same end. At a minimum there would be a genuine issue of disputed fact on the question of invalidity, and summary judgment would be inappropriate.

The district court construed "database" to mean "a collection of data with a given structure that can be stored and retrieved," thus including both file (hierarchical) and relational systems. *MySpace, Inc.*, 756 F. Supp. 2d at 1232. This was essentially the construction urged by the MySpace parties. GraphOn argues that we should reverse the district court's "database" construction and redefine it as limited to a relational database. In GraphOn's view, the claims, written description, and file histories limit the term to relational databases. Thus, according to GraphOn, hierarchical databases, such as the file system used by the MBB, cannot be prior art.

In construing the claims, we begin with an examination of the ordinary and customary meaning of the claim language itself in the context of the written description of the invention found in the patent, and the prosecution history. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc); *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005). Indeed, we have deemed the written description the "best source" for understanding the technical meaning of a claim term. *Phillips*, 415 F.3d at 1315. But limitations from parts of the written description, such as the details of the pre-

ferred embodiment, cannot be read into the claims absent a clear intention by the patentee to do so. *Teleflex, Inc. v. Ficosa North Am. Corp.*, 299 F.3d 1313, 1326 (Fed. Cir. 2002).

It has been suggested that a reading of this court's claim construction cases indicates that outcomes depend on the judges' predilection for one of two approaches.[2] One approach is to focus on the invention disclosed in the patent: "[t]ry to understand what the inventor has invented (what he says is his contribution in the art) and then choose the claim meaning that best fits the invention."[3] The other is to focus on the words that the prosecuting lawyer used to craft the claims and "then apply legal rules of construction to divine the meaning of the claim."[4] While this is insightful regarding the approaches highlighted in one or another of our cases, it is an over-simplification to suggest that these are competing theories; rather, they are complementary. An inventor is entitled to claim in a patent what he has invented, but no more.[5] He can, however, claim less, to avoid prior art or for any other reason. Therefore, in construing a claim there are two limiting factors—what was invented, and what exactly was claimed. To determine the former—what was invented—we look at the entire patent, with particular attention to the specification (the written description of the invention and the several claims made). To determine the latter—what exactly was claimed—the

---

[2]    For a recent exposition of this, *see* Brad Lyerla, *Understand the Two Approaches to Claim Constructions*, Managing Intellectual Property, November 2011, at 47.

[3]    *Id.*

[4]    *Id.*

[5]    *See Carnegie Mellon Univ. v. Hoffman-La-Roche Inc.*, 541 F.3d 1115, 1122 (Fed. Cir. 2008); *see also Retractable Tech., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1311 (Fed. Cir. 2011) (Plager, J., concurring).

focus is on the precise words of the particular claim or claims at issue; the written description and preferred embodiments are aids in understanding those words. In the case before us, proper claim construction requires that we understand what the invention encompasses as well as how the claims are stated.

The "Summary of the Invention" section of the written description for all four of the patents-in-suit broadly describes the database as being a collection of user entries that "are automatically collected, classified and stored . . . in a searchable and retrievable form." '538 Patent col.3 ll.2-3. All types of databases—relational, hierarchical, or otherwise—are searchable and retrievable. Thus, nothing in this language serves to limit the invention to a relational database.

Further, the "Background of the Invention" section discusses the limitations of prior art systems in placing "databases of various kinds" directly on the web, and suggests that the disclosed invention overcomes those disadvantages. *See, e.g.*, '538 Patent col.1 l.37 and col.2 ll.57-58. Taken together, this language indicates that the general term "database" in the claims can encompass any of the "various kinds" of databases known in the art at that time.

GraphOn argues that the "various kinds" modifier used in the written description was meant to refer to various kinds of relational databases as opposed to the structure of the database itself. We agree with the district court that this argument is not supported by the context. For example, the "Detailed Description of the Preferred Embodiments" section discusses a type of search called a "category search" in which the "[c]ategories are represented in computer memory in the form of a tree structure . . . [in which] the user can click

on any category to go to the next level, and can click on any entry to bring up the mini page of the entry." '538 Patent col.11 ll.1-7. Such "tree structure" terminology is more consistent with the organizational structure of a hierarchical database rather than a relational database.

While this preferred embodiment does not itself limit the claims, it does suggest that the inventors intended that the invention encompass various database features, including those of hierarchical databases. *See Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1383 (Fed. Cir. 2008) ("Our case law generally counsels against interpreting a claim term in a way that excludes the preferred embodiment from the scope of the invention."). Because the preferred embodiments describe features contained in multiple types of databases[6] and the written description is devoid of a clear indication that the invention should be limited to one particular type of database, it would be improper to limit the construction to relational databases.

Thus we conclude that the district court's claim construction of "database" is both reasonable and supported by the context.

## 2. Invalidity Under §§ 102 and 103

The district court held all the claims at issue invalid under a combination of sections 102 and 103 of the Patent Act. We review a district court's grant of summary judgment of invalidity without deference, drawing all reasonable inferences in favor of the non-movant and reapplying the standards used by the district court. *Slip Track Sys., Inc. v. Metal-Lite, Inc.*, 304 F.3d 1256, 1262 (Fed. Cir.

---

[6] *See, e.g.*, col.4 ll.11-14 (discussing features of relational databases) and col.11 ll.1-7 (discussing features of hierarchical databases).

2002). When, as here, the facts underlying an invalidity determination are not in dispute, we determine "whether summary judgment of invalidity is correct by applying the law to the undisputed facts." *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1366 (Fed. Cir. 2011).

Even given the district court's construction of the term "database," GraphOn argues that the district court erred in its conclusion that all the claims were either invalid as being anticipated under 35 U.S.C. § 102 or obvious under 35 U.S.C. § 103. GraphOn argues that the court merely analyzed the claims on a limitation-by-limitation basis rather than discussing the claim language as a whole. It is certainly true that section 102 speaks in terms of "the invention" having been in public use more than one year prior to the date of the application for patent, and that section 103 requires that the subject matter "as a whole" would have been obvious at the time the invention was made. *See* 35 U.S.C. §§ 102(b), 103(a). Thus, ordinarily we would expect the district court to conduct a complete assessment of the claim language. Trial courts analyzing claim limitations should strive to connect those limitations to the context of the claim as a whole when making summary judgment determinations regarding validity. Such a step may seem a bit pro forma to some, but as the statute and our cases make clear, patent claims are not judged solely by their individual limitations.[7]

---

[7]    *See, e.g.*, *Decisioning.com, Inc. v. Federated Dept. Stores, Inc.*, 527 F.3d 1300, 1314 (Fed. Cir. 2008); *Texas Instruments, Inc. v. U.S. Int'l Trade Comm'n*, 846 F.2d 1369, 1371 (Fed. Cir. 1988); *Ball Corp. v. United States*, 729 F.2d 1429, 1437 (Fed. Cir. 1984); *In re Gulack*, 703 F.2d 1381, 1385 (Fed. Cir. 1983).

Even so, such a discussion is not necessarily a prerequisite to the grant of summary judgment. In a case such as this, in which all the claims share a common term that lies at the heart of the invention, we conclude that the district court's analysis of the "database" term adequately supports the court's assessment that there is no triable issue of fact as to whether the MBB is a database as used in the claims. Thus we find no error in the trial court's overall conclusion that the claims are anticipated or obvious.

### 3. Invalidity Under § 101

The dissent proposes that this appeal should be decided under § 101 of the Patent Act, the section that describes what inventions are eligible for patenting, rather than, as we have done, under §§ 102 and 103, anticipation and obviousness. The dissent considers the subject matter eligibility requirements contained in § 101 to be an "antecedent question" that must be addressed before the court can reach the §§ 102 and 103 issues. Slip op. at 2. That position is not unique to the dissent; one can find support for it, as the dissent notes, in the literature and in the language found in some cases.[8] Other

---

[8] There is no shortage of judicial dicta to that effect. *See, e.g.*, *Dealertrack, Inc. v. Huber*, Nos. 2009-1566, 2009-1588, 2012 WL 164439, at *14 n.3 (Fed. Cir. Jan. 20, 2012) ("With all due respect, the dissent's effort to define a more efficient judicial process, as laudable a goal as that may be, faces several obstacles. First, the Supreme Court characterizes patent eligibility under § 101 as a 'threshold test.' *Bilski v. Kappos*, 130 S. Ct. 3218, 3225 (2010)"); *see also*, *Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.*, 543 F.3d 657, 661 (Fed. Cir. 2008) ("It has long been understood that the Patent Act sets out the conditions for patentability in three sections: sections 101, 102, and 103." (citing *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1 (1966))).

voices, however, urge judicial restraint in the face of what has become a plethora of opinions adding to our § 101 jurisprudence.[9]

At issue here was the validity of four patents, with all four patents addressing the same general subject matter. The trial court had before it several summary judgment motions challenging the validity of the patents under §§ 102 and 103 of the Patent Act. The trial court decided the case under those sections, finding the patents invalid, and that is the judgment now on appeal. Nevertheless, the dissent argues forcefully that we should not, indeed we cannot, reach those issues until we first address the § 101 question, stating that "[a] robust application of section 101 is required to ensure that the patent laws comport with their constitutionally-defined objective." Slip op. at 13. In the dissent's view, the patents in this case fall well short of the requirements under § 101 for patentable subject matter and thus are invalid, agreeing with the trial judge (and with us), but getting there through a different jurisprudential path.

Even assuming we could reach out for the § 101 issue without having it raised by the parties or decided by the trial court, there is an even more basic problem with the dissent's position. The problem with addressing § 101 initially every time it is presented as a defense is that the answer in each case requires the search for a universal truth: in the broad sweep of modern innovative technologies, does this invention fall outside the breadth of human endeavor that possibly can be patented under § 101?

The Supreme Court recognizes that Congress intended in this general provision that the patent laws

---

[9]    *See, e.g.*, the additional views of C.J. Rader and J. Newman, in *Classen Immunotherapies, Inc. v. Biogen IDEC*, 659 F.3d 1057, 1073-1075 (Fed. Cir. 2011).

should be given wide scope. *Diamond v. Chakrabarty*, 447 U.S. 303, 308 (1980). However, the Court has established, again in broad terms, three areas of activity that are excepted. These exceptions, according to the Court, are "laws of nature, physical phenomena, and abstract ideas." *Bilski v. Kappos*, 130 S. Ct. 3218, 3225 (2010) (citing *Chakrabarty*, 447 U.S. at 309). Over the years courts have found dealing with "laws of nature" and "physical phenomena" reasonably manageable. Though hardly brightline,[10] the standards that have emerged from the cases addressing these exceptions provide workable guidance.[11]

When it comes to explaining what is to be understood by "abstract ideas" in terms that are something less than abstract, courts have been less successful.[12] The effort has become particularly problematic in recent times when applied to that class of claimed inventions loosely described as business method patents. If indeterminacy of the law governing patents was a problem in the past,[13] it surely is becoming an even greater problem now, as the current cases attest.

---

[10]  For a recent effort at providing a "brightline," not particularly well-received, *see* the Government's proposed "magic microscope" test for defining laws of nature. *Ass'n for Molecular Pathology v. U.S. Patent & Trademark Office*, 653 F.3d 1329, 1353 (Fed. Cir. 2011).

[11]  *See, e.g.*, the "big three": *Diamond v. Diehr*, 450 U.S. 175 (1981); *Parker v. Flook*, 437 U.S. 584, 593 (1978); *Gottschalk v. Benson*, 409 U.S. 63 (1972).

[12]  As this court recently observed, "laws of nature and physical phenomena cannot be invented. Abstractness, however, has presented a different set of interpretive problems . . . .", *Ultramercial, LLC v. Hulu, LLC*, 657 F.3d 1323, 1326 (Fed. Cir. 2011).

[13]  S. Jay Plager, *Challenges for Intellectual Property Law in the Twenty-First Century: Indeterminancy and Other Problems,* 2001 U. Ill. L. Rev. 69 (2001).

In an attempt to explain what an abstract idea is (or is not) we tried the "machine or transformation" formula—the Supreme Court was not impressed. *Bilski*, 130 S. Ct. at 3226-27. We have since acknowledged that the concept lacks of a concrete definition: "this court also will not presume to define 'abstract' beyond the recognition that this disqualifying characteristic should exhibit itself so manifestly as to override the broad statutory categories of eligible subject matter . . . ." *Research Corp. Techs., Inc. v. Microsoft Corp.*, 627 F.3d 859, 868 (Fed. Cir. 2010).

Our opinions spend page after page revisiting our cases and those of the Supreme Court, and still we continue to disagree vigorously over what is or is not patentable subject matter. *See, e.g.*, *Dealertrack, Inc. v. Huber*, Nos. 2009-1566, 2009-1588, 2012 WL 164439 (Fed. Cir. Jan. 20, 2012) (Plager, J., dissenting-in-part); *Classen Immunotherapies, Inc. v. Biogen IDEC*, 659 F.3d 1057 (Fed. Cir. 2011) (Moore, J., dissenting); *Ass'n for Molecular Pathology*, 653 F.3d 1329 (Fed. Cir. 2011) (concurring opinion by Moore, J., dissenting opinion by Bryson, J.); *see also In re Ferguson*, 558 F.3d 1359 (Fed. Cir. 2009) (Newman, J., concurring).

This effort to descriptively cabin § 101 jurisprudence is reminiscent of the oenologists trying to describe a new wine. They have an abundance of adjectives— earthy, fruity, grassy, nutty, tart, woody, to name just a few[14]— but picking and choosing in a given circumstance which ones apply and in what combination depends less on the assumed content of the words than on the taste of the tongue pronouncing them.

Beyond railing at the problem, there is the alternative that Congress has provided—a clear path for courts in

---

[14]    Richard P. Vine, Ph.D., Wine Appreciation 439-65 (2d ed. 1997).

deciding the question of patent validity.  In section 282 of the Patent Act, Congress created a presumption of validity for an issued patent, and then specified the "defenses in any action involving the validity . . . of a patent." These are "any ground specified in part II of this title as a *condition of patentability*" (emphasis added), and "failure to comply with any requirement of sections 112 or 251 of this title."[15]  The two sections of part II that Congress has denominated as "conditions of patentability" are § 102 ("novelty and loss of right to patent") and § 103 ("nonobvious subject matter").

In each of sections 102, 103, and 112, the validity issue turns on whether one or more of the particular claims in the patent are rendered invalid by the specific criteria of the statutory section as applied to that claim.  These criteria are well developed and generally well understood.[16]  In most cases when properly applied they will

---

[15]  Section 251 of the Patent Act relates to "Reissue of defective patents." an issue not involved in this case.

[16]  *See. e.g.. Graham.* 383 U.S. 1 (1966) (stating the framework for an objective analysis for determining obviousness under 35 U.S.C. § 103); *Merck & Co., Inc. v. Teva Pharm. USA, Inc.,* 347 F.3d 1367, 1372 (Fed. Cir. 2003) ("An 'anticipating' reference must describe all of the elements and limitations of the claim in a single reference, and enable one of skill in the field of the invention to make and use the claimed invention."): *Ariad Pharm.. Inc. v. Eli Lilly & Co.. 598 F. 3d 1336. 1351 (Fed. Cir. 2010)* (en banc) ("the test for [written description] is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date."): *In re Wands.* 858 F.2d 731. 737 (Fed. Cir. 1988) (listing "[f]actors to be considered in determining whether a disclosure would require undue experimentation" to assess compliance with the enablement requirement of 35 U.S.C. § 112): and *Metabolite Labs.. Inc. v. Lab. Corp. of Am. Holdings,* 370 F.3d 1354, 1366, (Fed. Cir. 2004) ("The

address the specifics of the case and decide that particular case, nothing more. No universal truths need be found that are necessarily applicable to the scope of patents generally, and in deciding the case the corpus of jurisprudence need not be expanded, contracted, redefined, or worse, become the source of yet more abstractions.

Rather than taking the path the dissent urges, courts could avoid the swamp of verbiage that is § 101 by exercising their inherent power to control the processes of litigation, *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991), and insist that litigants initially address patent invalidity issues in terms of the conditions of patentability defenses as the statute provides, specifically §§ 102, 103, and 112. If that were done in the typical patent case, litigation over the question of validity of the patent would be concluded under these provisions, and it would be unnecessary to enter the murky morass that is § 101 jurisprudence. This would make patent litigation more efficient, conserve judicial resources, and bring a degree of certainty to the interests of both patentees and their competitors in the marketplace.

In a sense, § 101 of the Patent Act can be thought of as the patent law analogy to the Bill of Rights of the Constitution. The latter sets in the broadest terms ("due process," "equal protection") the fundamental parameters of the citizenry's legal right. In the context of patent law, § 101 similarly describes in the broadest terms the legally-protected subject matter an inventor can seek to patent: a "process, machine, manufacture, or composition of matter . . . ." The Supreme Court has wisely adopted a

---

requirement to 'distinctly' claim [under 35 U.S.C. § 112 ¶ 2] means that the claim must have a meaning discernible to one of ordinary skill in the art when construed according to correct principles.").

policy of not deciding cases on broad constitutional grounds when they can be decided on narrower, typically statutorily limited, grounds.[17] Following the Supreme Court's lead, courts should avoid reaching for interpretations of broad provisions, such as § 101, when more specific statutes, such as §§ 102, 103, and 112, can decide the case.

It is interesting to note that the United States in its amicus curiae brief to the Supreme Court in the *Prometheus* litigation—a long-running § 101 dispute that has had two trips to the Supreme Court from this court—noted to the Court, and indeed devoted part of its brief to, the likelihood that the disputed claims were invalid under §§ 102 or 103.[18] The point being that, in complex cases such as that one, it is better to leave the question of validity to those specific provisions of the Patent Act which, as the Government states, "permit more nuanced factual distinctions [and] are the principal tools that Congress has provided for 'drawing a line between the things which are worth to the public the embarrassment of an exclusive patent, and those which are not.'" *Id.* at 32 (citing *Graham*, 383 U.S. 1, 9 (1966) quoting Thomas

---

[17] *See* Roberts, C.J., (dissenting) in *Boumediene v. Bush*, 553 U.S. 723, 805-06 (2008): ("If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such [questions are] unavoidable," citing *Spector Motor Service, Inc. v. McLaughlin*, 323 U.S. 101, 105 (1944), and "Constitutional questions should not be decided unless 'absolutely necessary to a decision of the case,'" (quoting *Burton v. United States*, 196 U.S. 283, 295 (1905) in *Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring)).

[18] *See* Brief for the United States as Amicus Curiae Supporting Neither Party at 26-32, *Mayo Collaborative Serv. v. Prometheus Labs., Inc.*, (No. 10-1150), 2011 WL 4040414.

Jefferson). What a waste of time and resources it would prove to be if the dispute between the *Prometheus* parties eventually gets resolved on the grounds the Government predicts.

Adopting this practice would also preclude § 101 claims from becoming the next toss-in for every defendant's response to a patent infringement suit, particularly in business method litigation. We wrestled for years with the toss-in problem when defendants claimed "inequitable conduct" in just about every infringement case. Only recently did we finally fashion the stopper, which we hope will work. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011).[19] We need not go through a similar exercise with § 101.

Does this mean that § 101 can never be raised initially in a patent infringement suit? No. For one, in certain technology fields, and particularly when laws of nature or physical phenomena are the issue, efficiency may dictate applying the coarse filter of § 101 first to address legitimate questions of patent eligibility. *See, e.g, Ass'n for Molecular Pathology*, 653 F.3d 1329 (patentability of isolated DNA). Even when the patent invokes the abstractness issue, such as in a business method patent, if it is clear and convincing beyond peradventure—that is, under virtually any meaning of "abstract"—that the claim at issue is well over the line, then a case could be made

---

[19] See, e.g., Lee F. Johnston, *The Therasense Decision: Just What the Doctor Ordered or Will the Inequitable Conduct Plague Mutate and Survive?,* 23 No. 9 Intell. Prop. & Tech. L.J. 14 (2011); and Zhe Peng et al., *A Panacea for Inequitable Conduct Problems or Kingsdown Version 2.0? The Therasense Decision and a Look into the Future of U.S. Patent Law Reform,* 16 Va. J.L. & Tech. 373 (2011).

for initially addressing the § 101 issue in the infringement context.

But that latter patent would be a rather unusual and infrequent circumstance. More often, when the question of abstractness is presented in its usual abstract terms, the trial court could as a matter of case management summarily put aside the § 101 defense on whatever grounds seem applicable in the case. The litigants will then be left to address the invalidity defenses of §§ 102, 103, and 112, as the statute provides, and the litigants, the trial court, and this court on review would have some semblance of a chance at arriving at a predictable and understandable result.[20]

In the case before us, for all these reasons the proper course of action is the one that the trial court and the panel majority has followed: decide the case on the question of compliance with §§ 102 and 103 as Congress has instructed, and decline the dissent's invitation to put the parties and this court in the swamp that is § 101 jurisprudence.

### 4. Other Issues

GraphOn raises a number of other issues regarding which it also finds fault with the trial court's determinations. We find none of them persuasive, nor, in the face of

---

[20] Ultimately, the solution to solving the puzzle of § 101 will require close collaboration between the courts and the Patent and Trademark Office (PTO), the latter providing an initial forum for understanding what can and cannot be patented. How best to structure that collaboration so as to maximize efficiency and fairness for both inventors and competitors remains to be seen. The PTO has begun the process—*see* "Interim Guidance for Determining Subject Matter Eligibility for Process Claims in View of *Bilski v. Kappos*." 75 Fed. Feg. 43,922 (July 27, 2010).

the invalidity determination set forth above, in any way determinative.

GraphOn first asserts that the district court improperly concluded that the MBB stored images. According to GraphOn, the MBB did not actually store images, but instead it stored hyperlinks to places where the images could be retrieved. Consequently, because the image itself was not stored in the MBB database GraphOn argues that it cannot invalidate the claims.

We are not persuaded by this argument. It is undisputed that the MBB had the ability to include a user-supplied image. *MySpace, Inc.*, 756 F. Supp. 2d at 1238. Based on the trial court's construction of the term "image," which has not been appealed, whether an image is displayed by physically storing the image in the database or storing a hyperlink in the database is irrelevant. We also agree with the trial court that even if the MBB somehow did not describe the image limitation due to its use of hyperlinks, it would have been obvious to one of ordinary skill in the art to have modified the database to allow for the uploading of actual images.

GraphOn also takes issue with the trial court's analysis of whether "transaction ID," a claim limitation found in the claims of the '538 Patent, was anticipated or rendered obvious by the MBB. The court adopted the parties' proposed definition that "transaction ID" means "a unique identifier for a particular database entry." *Id.* at 1239. GraphOn argues that because the transaction IDs of the MBB would sometimes be reused, they were not unique. GraphOn also alleges that in order to make changes to an entry in the MBB, the entire entry had to be deleted and recreated. Because the newly created entry did not necessarily have the same transaction ID as the original

entry, GraphOn argues that the transaction ID did not continue throughout the life of the MBB entry.

Again, we are not persuaded by either of these positions. The trial court concluded, and we agree, that MBB entries maintained the same transaction ID number for the life of the entry and there is no evidence indicating that the same transaction ID would appear more than once in the MBB at a given time. *Id.* at 1240. Thus, there is no error in the court's conclusion that no triable issue of fact exists regarding the "transaction ID" limitation.

GraphOn further argues that the district court erred in its determination "that at least one user of the MBB used a password to restrict access to an entry." *Id.* at 1241. GraphOn's position appears to be that because the password protection feature in the MBB did not prevent the administrator from deleting entries, there is an issue of material fact as to whether the MBB's password feature constituted password protection as used in the claims. Again, we disagree with GraphOn. The court adopted the parties' agreed upon construction that "password protecting" means "restricting access to the data by means of a password." *Id.* at 1240. We agree with the trial court that this construction "does not require that the system require passwords in all instances, or that the system restrict access by all other users." *Id.*

Lastly, GraphOn asserts that the district court erred in its determination that the MBB describes the "update" and "modify" limitations contained within the '940 and '034 patents. Specifically, GraphOn asserts that MBB entries were not actually "updated" when users made changes to existing entries, but instead they were replaced. The entry was dropped from the file system and replaced with a new entry. We agree with the trial court that the specification does not require the updating to be

carried out in any particular manner. *Id.* at 1242. Consequently, the fact that an MBB entry was replaced in the file system as opposed to being edited makes no difference in the validity analysis.

For the aforementioned reasons, we find no error in the trial court's determinations regarding these issues.

Finally, GraphOn asserts broadly that the district court erred in its application of the *Graham* factors used for determining whether a patent can be invalidated for obviousness, and in particular with regard to evidence of secondary considerations of nonobviousness. In *Graham* the Supreme Court held that four factual findings should be made before invalidating a patent for obviousness: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) secondary considerations of nonobviousness. *Graham*, 383 U.S. 1, 17-18 (1966). GraphOn asserts that the district court failed to make specific findings on each of these *Graham* factors in its summary judgment opinion and that this lack of specific findings implies that the court erred.

We do not require that district courts enumerate each of the *Graham* factors when making an obviousness determination. "Where the record adequately supports the judgment, the district court does not have an obligation to recite every detail of its reasoning." *Lexion Med. LLC v. Northgate Techs, Inc.*, 641 F.3d 1352, 1359 (Fed. Cir. 2011). While it would certainly assist the parties and the appeals court if the district court more clearly recited its reasoning regarding each of the *Graham* factors, we do not wish to overburden our trial courts when the record establishes that the evidence was properly before and considered by the court. *See Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 990 (Fed. Cir. 1988) ("It would

have been preferable if the court had enumerated the *Graham* factors and systematically presented its analysis in terms of these factors.  However, there is no reversible error if the required factual determinations were actually made and it is clear that they were considered while applying the proper legal standard of obviousness."); *see also Apple Computer, Inc. v. Articulate Systems, Inc.*, 234 F.3d 14, 26 (Fed. Cir. 2000) ("A failure to enumerate and analyze the *Graham* factors explicitly is not necessarily reversible error, provided the proper factual determinations were made and the court considered them in rendering its conclusion of obviousness.").  Here, the parties presented extensive arguments both through their briefs and during the hearing regarding the *Graham* factors and, in particular, GraphOn's assertions of secondary considerations of nonobviousness.  Seeing no error in the trial court's handling of this evidence, we affirm.

CONCLUSION

For the foregoing reasons, we affirm the district court's order granting summary judgment of invalidity of the patents-in-suit.

**AFFIRMED**

# United States Court of Appeals for the Federal Circuit

---

**MYSPACE, INC.,**
*Plaintiff-Appellee,*

**and**

**FOX AUDIENCE NETWORK, INC.,**
*Third Party Defendant-Appellee,*

**and**

**CRAIGLIST, INC.,**
*Plaintiff-Appellee,*

**v.**

**GRAPHON CORPORATION,**
*Defendant/Third Party Plaintiff-Appellant.*

---

2011-1149

---

Appeal from the United States District Court for the Northern District of California in consolidated case nos. 10-CV-0604 and 10-CV-1156, Judge Elizabeth D. LaPorte.

---

MAYER, *Circuit Judge*, dissenting.

The issue of whether a claimed method meets the subject matter eligibility requirements contained in 35 U.S.C. § 101 is an "antecedent question" that must be addressed before this court can consider whether particular claims

are invalid as obvious or anticipated. *In re Comiskey*, 554 F.3d 967, 975 n.7 (Fed. Cir. 2009). GraphOn Corporation ("GraphOn") owns four patents, U.S. Patent Nos. 6,324,538 (the "'538 patent"), 6,850,940, 7,028,034, and 7,269,591, which contain exceedingly broad claims to a system that allows users to exert control over the content of their online communications. This court must first resolve the issue of whether the GraphOn patents are directed to an unpatentable "abstract idea" before proceeding to consider subordinate issues related to obviousness and anticipation. *See Bilski v. Kappos***,** 130 S. Ct. 3218, 3225 (2010) (noting that whether claims are directed to statutory subject matter is a "threshold test"); *Parker v. Flook*, 437 U.S. 584, 593 (1978) ("*Flook*") (emphasizing that "[t]he obligation to determine what type of discovery is sought to be patented" so as to determine whether it falls within the ambit of section 101 "must precede the determination of whether that discovery is, in fact, new or obvious"); *Comiskey*, 554 F.3d at 973 ("Only if the requirements of § 101 are satisfied is the inventor allowed to pass through to the other requirements for patentability, such as novelty under § 102 and . . . non-obviousness under § 103." (citations and internal quotation marks omitted)). I therefore respectfully dissent from the court's judgment.

## I.

"[A] principle is not patentable. A principle, in the abstract, is a fundamental truth; an original cause; a motive; these cannot be patented, as no one can claim in either of them an exclusive right." *Le Roy v. Tatham*, 55 U.S. (14 How.) 156, 175 (1853). In *Bilski***,** the Supreme Court rejected a method of hedging against risk in the commodities markets as an unpatentable "abstract idea." 130 S. Ct. at 3230 ("[A]ll members of the Court agree that the patent application at issue here falls outside of § 101

because it claims an abstract idea."). The Court explained that Bilski's application essentially disclosed "the basic concept of hedging, or protecting against risk" and that allowing him "to patent risk hedging would preempt use of this approach in all fields, and would effectively grant a monopoly over an abstract idea." *Id.* at 3231.

The claims of the GraphOn patents are significantly broader in scope and have the potential to wield far greater preemptive power than those at issue in *Bilski*. In the mid-1990s, companies frequently relied on online service providers such as Yahoo! Corporation ("Yahoo") to advertise their products and services on the Internet. *See MySpace, Inc. v. GraphOn Corp.*, 756 F. Supp. 2d 1218, 1223 (N.D. Cal. 2010) ("*District Court Decision*"). According to GraphOn, Yahoo "arbitrarily edited and categorized each listing or database entry," which resulted in Internet listings that contained "typographical errors" and "were difficult to search." *Id.* The patents-in-suit purport to solve this problem by creating a system that allows users to control the content and categorization of their own database entries. *See* '538 patent, col. 2, ll.61-64 ("The present invention . . . uses a computer network and a database to provide a hardware-independent, dynamic information system in which the information content is entirely user-controlled."). GraphOn alleges that its patents "changed the state of the art by empowering [users] to create an Internet or network presence under their own terms and for much cheaper." Appellant Br. 12.

The potential scope of the GraphOn patents is staggering. They arguably cover any online system in which users control the content and categorization of their own communications. The claims thus cut across vast swaths of the Internet and potentially extend to most online advertising and social networking sites. *See id.* at 44

(stating that adoption of GraphOn's claimed method has been so "widespread" that it "approach[es] the level of a universal standard"). Indeed, GraphOn has already asserted its patents against many of the most influential participants in the Internet marketplace, including Yahoo, Google Inc., MySpace, Inc., Fox Audience Network, Inc., craigslist, Inc., AutoTrader.com, and eHarmony.com. *See* Joint App'x 35. To date, GraphOn has succeeded in obtaining lump-sum licensing agreements worth nearly $10 million for use of its claimed system. *See* Appellant Br. 12; Joint App'x 1607.

In rejecting Bilski's application, the Supreme Court noted that "[h]edging is a fundamental economic practice long prevalent in our system of commerce and taught in any introductory finance class." *Bilski*, 130 S. Ct. at 3231 (citations and internal quotation marks omitted). The GraphOn patents are likewise directed to a fundamental and widely understood concept. The idea that information can be stored in a computer database by one person and then accessed, in an unedited form, by another person is a fundamental tenet of network computing and one that is likely to be taught in any basic computer science course. Indeed, as the common specification to the GraphOn patents correctly notes, the claimed system operates much "[l]ike a publically-accessible bulletin board" because "the content that is posted . . . is entirely within the control of the user, both at the time the entry is posted and all times thereafter." '538 patent, col.10, ll.38-41.

The methods disclosed in Bilski's application and in the GraphOn patents are not unpatentable because they lack any practical utility. To the contrary, they fall outside the ambit of section 101 because they are *too* useful and *too* widely applied to possibly form the basis of any patentable invention. Bilski's claimed method was rejected because avoiding excessive economic risk has

long been a cornerstone of commercial enterprise.  *See Bilski*, 130 S. Ct. at 3231.  Here, the concept of allowing users to control the content of their online communications is "abstract" because free and unrestricted Internet communication has become a staple of contemporary life.  Permitting GraphOn to exert monopoly power over any online system that allows users to control the content of their own communications would preempt use of one of the "basic tools" of modern social and commercial interaction.[1]  *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972) ("*Benson*") (emphasizing that "abstract intellectual concepts are not patentable, as they are the basic tools of scientific and technological work"); *Flook*, 437 U.S. at 593 n.15 (explaining that "in granting patent rights, the public must not be deprived of any rights that it theretofore freely enjoyed" (citations and internal quotation marks omitted)).

GraphOn cannot avoid the strictures of section 101 simply because its claimed method discloses very specific steps for allowing users to create and modify database entries.  The Supreme Court has rejected the argument "that if a process application implements a principle in some specific fashion, it automatically falls within the patentable subject matter of § 101 . . . ."  *Flook*, 437 U.S. at 593.  Indeed, Bilski's application was deemed unpatentable notwithstanding the fact that claim 4 recited a mathematical formula for implementing the claimed method, *Bilski*, 130 S. Ct. at 3223, and claim 7 disclosed a specific method of using historical weather-related data in order to calculate how much a seller would "gain from each transaction under each historical weather pattern," *id.* at 3224 (citations and internal quotation marks omit-

---

[1]    The GraphOn patents likewise raise significant First Amendment concerns by granting a private party the right to impose broad restrictions on the free flow of ideas and information over the Internet.

ted).  *See also Flook*, 437 U.S. at 593-95 (concluding that a very specific method for updating an alarm limit during a catalytic conversion process was impermissibly abstract); *Benson*, 409 U.S. at 67-70 (rejecting as unpatentable a specific method of converting binary-coded decimals into pure binary numerals).

"[T]he patent system represents a carefully crafted bargain that encourages both the creation and the public disclosure of new and useful advances in technology, in return for an exclusive monopoly for a limited period of time." *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 63 (1998).  A patentee does not uphold his end of this "bargain" if he seeks broad monopoly rights over a basic concept or fundamental principle without a concomitant contribution to the existing body of scientific and technological knowledge.  Bilski's application was rejected because it did not "add" anything to the basic concept of hedging against economic risk.  *Bilski*, 130 S. Ct. at 3231 (emphasizing that Bilski's "claims add even less to the underlying abstract principle than the invention in *Flook* did").  The claimed hedging method was deemed impermissibly abstract because it was implemented using only *"familiar* statistical approaches" and *"well-known* random analysis techniques."  *Id.* at 3224, 3231 (emphases added).  In *Benson*, likewise, the Court rejected a method as patent ineligible where the mathematical procedures required by the claimed algorithm could "be carried out in existing computers long in use, no new machinery being necessary."  409 U.S. at 67.  Similarly, in *Flook*, the Court rejected an application where the claimed algorithm would be applied to "an otherwise conventional method" for catalytic conversion.[2]  437 U.S. at 588.

---

[2]    The question of whether a claimed method is implemented using only conventional or well-known means

Many software and business method patents simply describe a basic, well-known concept that has been implemented or applied using conventional computer technology. These "inventions" rely on functions—such as storing data, and organizing, outputting, and displaying information—that any general purpose computer routinely performs. While running a particular process on a computer undeniably improves efficiency and accuracy, cloaking an otherwise abstract idea in the guise of a computer-implemented claim is insufficient to bring it within section 101.[3] *See Flook*, 437 U.S. at 586 (rejecting

---

is, of course, directly relevant to the issue of whether it satisfies section 103's non-obviousness requirements. However, that question can also be important in determining whether a claimed method recites patent eligible subject matter. To the extent that a claimed method can be implemented using "well-known . . . techniques," *Bilski*, 130 S. Ct. at 3231, "existing computers," *Benson*, 409 U.S. at 67, or "conventional method[s]," *Flook*, 437 U.S. at 588, it is likely that the applicant is seeking patent protection for an idea itself rather than for a particular application of that idea. In essence, the use of conventional technology to implement an otherwise abstract idea is insufficient to bring a process within the ambit of section 101 because it constitutes nothing more than "insignificant postsolution activity." *Diamond v. Diehr*, 450 U.S. 175, 191-92 (1981) ("*Diehr*") ("[I]nsignificant postsolution activity will not transform an unpatentable principle into a patentable process.").

[3]    In *Diehr*, the Supreme Court made clear that an application drawn to statutory subject matter does not become patent ineligible simply because it recites the use of a computer. 450 U.S. at 185. The Court noted that "[i]ndustrial processes" have historically been eligible for patent protection and concluded "that a physical and chemical process for molding precision synthetic rubber products falls within the § 101 categories of possibly patentable subject matter." *Id.* at 184. The Court em-

an application disclosing an algorithm that was "primarily useful for computerized calculations"); *Benson*, 409 U.S. at 71 (rejecting claims drawn to a method of converting binary-coded decimals which had "no substantial practical application except in connection with a digital computer"); *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366 (Fed. Cir. 2011) (concluding that a method of detecting credit card fraud was patent ineligible, notwithstanding the fact that the patent recited the use of existing computers and the Internet). Given the ubiquity of computers in contemporary life, allowing a process to become patentable simply because it is computer-implemented or invokes the use of the Internet would render the subject-matter eligibility criteria contained in section 101 virtually meaningless. *See Dealertrack, Inc. v. Huber*, Nos. 2009-1566, 2009-1588, 2012 U.S. App. LEXIS 1161 at *48-49 (Fed. Cir. Jan. 20, 2012) (concluding that claims drawn to a "computer-aided" method of processing information through a clearinghouse fell outside the ambit of section 101); *CyberSource*, 654 F.3d at 1375 (emphasizing "that the basic character of a process claim drawn to an abstract idea is not changed by claiming only its performance by computers, or by claiming the process embodied in program instructions on a computer readable medium").

---

phasized that the application was "not limited to the isolated step of programming a digital computer," but instead "describe[d] a process of curing rubber beginning with the loading of the mold and ending with the opening of the press and the production of a synthetic rubber product that has been perfectly cured—a result heretofore unknown in the art." *Id.* at 193 n.15 (internal quotation marks omitted). In other words, the application was patent eligible because it did not simply take a well-known concept or algorithm and implement it on a computer, but instead disclosed a new—"heretofore unknown in the art"—technology for curing rubber.

In 1995, when the parent application for the GraphOn patents was filed, the Internet had already undergone "explosive" growth. '538 patent, col.1, ll.16-20. Furthermore, the practices of posting and searching for information over the Internet and of creating a searchable computer database were well-established. *See District Court Decision*, 756 F. Supp. 2d at 1222-25, 1232, 1239-41. It appears, therefore, that GraphOn simply took the concept of allowing a user to control the content and categorization of his own communications and implemented it using conventional computer technology.

## II.

There are those who suggest section 101 should function as a wide and "broadly permissive" portal to patentability. *Ultramercial, LLC v. Hulu, LLC*, 657 F.3d 1323, 1326 (Fed. Cir. 2011). They take the view that section 101 is a "coarse eligibility filter" and that other patent validity requirements—such as novelty, *see* 35 U.S.C. § 102, non-obviousness, *see id.* § 103, and adequate written description, *see id.* § 112—should be used to weed out patents of dubious quality. *Research Corp. Techs., Inc. v. Microsoft Corp.*, 627 F.3d 859, 869 (Fed. Cir. 2010); *but see Classen Immunotherapies, Inc. v. Biogen IDEC*, 659 F.3d 1057, 1076 (Fed. Cir. 2011) (Moore, J., dissenting) (arguing that a method directed to a schedule for administering immunizations "claimed a monopoly over the scientific method itself" and was "so basic and abstract as to be unpatentable subject matter" under section 101).

There are several insurmountable problems with this approach. First, it has, as a practical matter, proved woefully inadequate in preventing a deluge of very poor quality patents. *See Bilski*, 130 S. Ct. at 3259 (Breyer, J., joined by Scalia, J., concurring in the judgment) (noting

that patents granted in the wake of *State St. Bank & Trust Co. v. Signature Fin. Group, Inc.*, 149 F.3d 1368, 1373 (Fed. Cir. 1998), have "ranged from the somewhat ridiculous to the truly absurd" (citations and internal quotation marks omitted)). "[T]here is no evidence that relying on §§ 102, 103, or 112 will solve the problem [of poor quality business method and software patents]. This claim was made ten years ago. It is still being made now. At what point does this argument run out of credibility?" Gerard N. Magliocca, *Patenting the Curve Ball: Business Methods and Industry Norms*, 2009 BYU L. Rev. 875, 900 (2009) (footnote omitted).

More fundamentally, there is nothing in *Bilski* to suggest that section 101 can be subverted by a misplaced reliance on sections 102, 103, or 112. To the contrary, the Court reaffirmed section 101's vital role by emphasizing that "[c]oncerns about attempts to call any form of human activity a 'process' can be met by making sure the claim meets the requirements of § 101." *Bilski*, 130 S. Ct. at 3226. Thus, while the scope of section 101 is broad, it is not unbounded. *Id.* at 3225. Prohibitions against patenting abstract ideas, physical phenomena, and laws of nature "have defined the reach of the statute as a matter of statutory *stare decisis* going back 150 years." *Id.* Indeed, the Court has explicitly rejected the contention that the section 101 subject matter eligibility analysis can be subsumed by the section 102 novelty and section 103 obviousness inquiries. *See Flook*, 437 U.S. at 588 (rejecting an application under section 101 even where it was "assume[d]" that the application met the requirements of sections 102 and 103); *see also Diehr*, 450 U.S. at 190 ("The question . . . of whether a particular invention is novel [under section 102] is *wholly apart* from whether the invention falls into a category of statutory subject

matter." (citations and internal quotation marks omitted) (emphasis added)).

*Bilski* contains nothing to indicate that patents on methods of doing business will, as a general matter, meet section 101's subject matter eligibility requirements.[4] Four justices of the Supreme Court concluded that claims drawn to methods of doing business are categorically ineligible for patent protection. *Bilski*, 130 S. Ct. at 3243 (Stevens, J., dissenting) (emphasizing that "regardless of how one construes the term 'useful arts,' business methods are not included"). While the five remaining justices declined to categorically exclude business methods from the scope of section 101, the Court[5] had nothing positive to say about affording patent protection to such methods. To the contrary, the Court emphasized that "[i]f a high enough bar is not set when considering patent applications of this sort, patent examiners and courts could be

---

[4]    The costs of our broken patent system are not abstract. *See* L. Gordon Crovitz, "Google, Motorola and the Patent Wars," Wall St. J., Aug. 22, 2011. Because technology companies are forced to spend enormous sums defending against vague and overbroad software and business method claims, they have far fewer dollars to expend on research and development. *Id.* ("Hobbled by a costly patent system, the technology industry is not the engine for global wealth and productivity it could be.").

[5]    Significantly, Justice Scalia did not join large sections of the plurality opinion. While he joined the portion of the Court's opinion stating that business methods qualified as "processes" and were therefore not categorically excluded from the scope of section 101, *Bilski*, 130 S. Ct. at 3228, he did not join Part II-C-2 of the opinion, which states that "the Patent Act leaves open the possibility that there are at least some processes that can be fairly described as business methods that are within patentable subject matter under § 101," *id.* at 3229.

flooded with claims that would put a chill on creative endeavor and dynamic change." *Id.* at 3229.[6] In fact, the Court gave a broad "hint" that while such methods were not categorically excluded from the scope of section 101, the statute's abstract idea exception might be an appropriate vehicle by which this court could invalidate patents on methods of doing business:

> [I]f the Court of Appeals were to succeed in defining a narrower category or class of patent applications that claim to instruct how business should be conducted, and then rule that the category is unpatentable because, for instance, it represents an attempt to patent abstract ideas, this conclusion might well be in accord with controlling precedent.

*Id.*

The Patent Clause of the Constitution empowers Congress to provide patent protection "[t]o promote the Progress of . . . [the] useful Arts, by securing for limited Times to . . . Inventors the exclusive Right to their . . . Discoveries." U.S. Const., art. I, § 8, cl. 8. The Supreme Court has cautioned that "[t]his is the *standard* expressed in the Constitution and it may not be ignored." *Graham v. John Deere Co.*, 383 U.S. 1, 6 (1966). By delineating the "kind of discoveries" that ought to be afforded patent protection, *Flook*, 437 U.S. at 593, section 101 is designed to meet the "great challenge" of "striking the balance

---

[6] The Court also emphasized that "some business method patents raise special problems in terms of vagueness and suspect validity," and that while the First Inventor Defense Act of 1999, 35 U.S.C. § 273(b)(1), "appears to leave open the possibility of some business method patents, it does not suggest broad patentability of such claimed inventions." *Bilski*, 130 S. Ct. at 3229 (citations and internal quotation marks omitted).

between protecting inventors and not granting monopolies over procedures that others would discover by independent, creative application of general principles," *Bilski*, 130 S. Ct. at 3228. A robust application of section 101 is required to ensure that the patent laws comport with their constitutionally-defined objective. *See Diehr*, 450 U.S. at 192 (explaining that a process claim meets the requirements of section 101 when, "considered as a whole," it "is performing a function which the patent laws were designed to protect").